[Civ. No. 18961. Fourth Dist., Div. One. June 24, 1980.]

ABATTI FARMS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

318

COUNSEL

Byrd, Sturdevant, Nassif & Pinney, Michael E. Merrill, Scott A. Wilson and Merrill & Schultz for Petitioner.

Marvin J. Brenner, Thomas M. Sobel and James E. Flynn for Respondent.

Marco E. Lopez, Jerome Cohen, Francis Fernandez, William H. Carder, Carmen Flores, Ellen S. Greenstone, Carlos Alcala, Tom Dalzell and Sanford N. Nathan for Real Party in Interest.

OPINION

**BROWN (Gerald), P. J.**—Abatti Farms, Inc., and Abatti Produce, Inc. (Abatti) petition for writ of review of a final order of the Agricultural Labor Relations Board (Board) pursuant to Labor Code section 1160.8. We have granted review to determine if substantial evidence in the whole record supports all the findings and orders of the Board. (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343-346 [156 Cal.Rptr. 1, 595 P.2d 579]; *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 491 [95 L.Ed. 456, 469, 71 S.Ct. 456].)

Abatti is an agricultural employer subject to the provisions of the Agricultural Labor Relations Act (Act), Labor Code section 1140 et seq. Abatti grows about 12 row crops on some 13,500 acres in Imperial County. Three entities manage the business, all owned and controlled by Ben and Tony Abatti, brothers. The enterprise is operated as a family business out of an office in El Centro. The entities are Abatti Farms, Inc., employing the year-round employees or "steadies"—drivers, irrigators, weeding and thinning crew—who maintain the land and crops; Abatti Produce, Inc., which employs seasonal employees to harvest, pack and ship the crops; and Abatti Bros., a partnership, which owns and leases the land.

The events scrutinized here arise out of organizing efforts of the charging party, United Farm Workers of America, AFL-CIO (UFW) during the Imperial Valley winter season of 1975-76. Abatti then em-

ployed about 200 seasonal workers and 100 to 300 steadies. The campaign at Abatti took place during November and December 1975, and the election held January 28, 1976, resulted in certification of UFW as bargaining representative of Abatti's employees. UFW then brought unfair labor practice charges against Abatti before the Board, including charges of denial of access, coercive interrogation of employees, and discriminatory discharge or refusal to rehire employees.

The Board found the following unfair labor practices had been committed: 1. Illegal surveillance, violating Labor Code section 1153, subdivision (a), by security guard, Kile, who approached groups of employees and organizers while they were talking or organizers were handing out leaflets at the gate to the Abatti premises, communicating the impression of spying on the workers;

2. Unlawful interrogation, consisting of Jose Rios (supervisor) telling employee Avitua she should vote for the Teamsters in the election, and telling her not to wear a UFW button;

3. Unlawful interrogation and threats to employees in the shovel crew by supervisor Ramon Gonzales;

4. Coercive interrogation consisting of statements by irrigator supervisor Charlie Figueroa to employee Abelino Ortega;

5. Discriminatory discharges and/or refusals to rehire 13 out of 14 charged discriminatees in violation of Labor Code section 1153, subdivisions (a) and (c).

The Board also found Abatti had committed an unfair labor practice in denying union organizers access to a shop on Abatti premises, on McCabe Road near Heber, during the prework hour of 5 to 6 a.m.

The final Board order provides: the above named unfair labor practices have been committed; Abatti shall cease and desist from unfair labor practices, sign a retraction notice, distribute the notice to all employees presently working for Abatti or who shall be hired during 12 months following issuance of the Board order, and mail the notice to past employees employed between December 13, 1975, and September 20, 1976; if addresses of former employees are not maintained, then

Abatti shall broadcast the notice on a southern San Diego County area radio station once a week for four weeks during the next peak hiring season; Abatti shall reinstate with back pay the 13 discriminatees; and finally, a Board agent shall have one hour company time access following reading of the notice to answer questions of employees.

## FACTS

### I. Denial of Access

Workers would congregate in the shop on McCabe Road before work both to get their instructions for the day and also in some cases to drink coffee, warm up, roll dice, and wait for work to start. Union organizers had claimed the right of access to those premises under Board regulations which grant access to employer's premises during the hour before and the hour after work and at other specified times provided such access does not disrupt the employer's operations. (Cal.Admin. Code, tit. 8, § 20900, subd. (e)(4)(c); see also *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 417 [128 Cal.Rptr. 183, 546 P.2d 687].) The UFW took the position work had not yet started, since the official starting time for steadies was 6 a.m., and further claimed no work was being performed in the shop which organizing efforts might disrupt. Abatti, however, denied access to organizers and in some cases had them arrested, because it claimed machinery repair work and other operations, including giving of instructions, was going on in the shop during that hour, and the union organizers interfered with those operations. Also, Abatti claimed the union had effective alternative means to communicate with the workers before work at the gate to the premises. The Board finding was the union may have some prework access to the shop during an organizational period, but must first ascertain when work really starts, consisting of the giving of instructions or like operations, and may then have access during the hour before such start. The Board also held to be unfair labor practices both the expulsion of an organizer, Juan Salazar, while he was attempting to address workers at the shop at 5 a.m. on December 15, 1975, and the citizen's arrest of five organizers on December 16 while "in lawful organizational activities" at the shop.

As we have stated, Board regulations which our Supreme Court has upheld permit nondisruptive access to the employer's premises during the hour before work. The Board here found such access was not dis-

ruptive. The transcript evidence conflicts on the question of disruption of work. We think the solution of the problem here reasonable, namely, permitting access to the shop area but leaving it to the union organizers to ascertain from Abatti personnel when work, in the form of instructions, actually starts. Access may then be had one hour before such starting time. The findings that organizing efforts do not disrupt types of work other than instructions, such as machine repair, are not inherently incredible. Although Ben Abatti testified repair work on machinery was going on in the shop at the specified time, he did not suggest anything about the nature of the operations which would make exclusion of the public necessary, such as the danger of flying fragments or fire or the necessary use of noxious chemicals. Organizing efforts would, obviously, interfere with the giving of instructions and therefore the Board found, and we agree, such efforts must precede the start of instructions. ■ We conclude the order permitting access before instruction begins is entitled to enforcement, and the findings of wrongful denial of such access should stand.

## II.   Surveillance of Employees

Some time in August 1975, Abatti hired a security guard, Kile, to prevent vandalism. UFW organizers testified he was stationed at the gate to the Abatti premises some time in September 1975, but Ben Abatti testified he was stationed there December 13, 1975, after the first arrest of a UFW organizer in the shop area. UFW organizers further testified Kile's presence at the Abatti gate was intimidating, interfering with their efforts to talk to workers and pass out leaflets there. However, other evidence indicated it was difficult to communicate at the gate in any event without blocking traffic, since there was a continuous flow of vehicles arriving through the gate each morning before work. Although three organizers testified the guard's presence was intimidating, no other employees testified he had been intimidated or coerced by that presence. Further, there is no evidence of acts of intimidation or brutality by Kile, other than his mere presence. Mere stationing of a security guard at the gate is not inherently coercive. In its brief before this court, the Board does not point to any record evidence of employee intimidation other than testimony of the union organizers, and relies mainly on what it regards as the suspicious timing of Kile's placement at the gate, just after the arrest of an organizer. Such an inference is not supported. ■ There is no evidence of "surveillance" as that term is normally understood.

### III. Illegal Interrogations and Threats

#### A. Supervisor Jose Rios, Employee Herlinda Avitua

Under this heading we discuss the various encounters between supervisor Rios and employee Herlinda Avitua, in the weeding and thinning crew. The ALO suggested one such interchange was an unfair labor practice, namely, Rios' asking Avitua if she signed a UFW authorization card, but advised dismissing the other charges, saying the conversations were friendly interchanges without coercive effect. The Board, however, found to the contrary and declared all the encounters were coercive interrogations violating the Labor Code. (§ 1153, subd. (a).)

The substance of Avitua's testimony is: she was friendly with Rios and with his daughter and rode to work with him before the election. (After the election the friendship cooled.) On one occasion he saw her wearing a UFW button and told her she should not wear it. She continued to wear it. The flavor of the conversation is that of cautionary advice rather than a command. Also, on another occasion, Rios asked her for whom she was going to vote, and when she responded she did not know, he advised her to vote for the "little horses" (caballitos), which is the Teamster symbol. She specifically testified the conversations were friendly and she was not intimidated by the questioning. Another employee, Elena Solano, strongly prounion, testified to overhearing some of the above conversations, but did not describe anything intimidating or unfriendly about them.

The ALO proposed as impermissible Rios' questions whether Avitua signed the card and also his remarks she should not have signed it, on the ground of intimidation, based on her testimonial demeanor. He recommended dismissing the charge about advising her to take off the button because the evidence did not establish a button was worn, although Avitua testified she wore it and her testimony was credited in establishing the coercive nature of the first interrogation. He said the statement about voting for the "little horses" was not made, crediting testimony of Rios who denied it, rather than Avitua. There is some inconsistency in these proposals and recommendations, now crediting one witness, now another, and there is no elaboration by the ALO of the reasons for suggesting intimidation. As stated, the witness herself denied intimidation. In any event, the Board went beyond the ALO and

found all of the above interchanges impermissible, because Rios had "exhibited an anti-union animus" and had "initiated the conversation at work without any legitimate reason or basis for seeking the requested information." The Board found it irrelevant Avitua was not actually intimidated, because in its view such questioning per se tends to interfere with the free exercise of employees' statutory bargaining rights.

### B. Shovel Crew Foreman Ramon Gonzales

Under this heading we discuss three incidents charged as impermissible interrogation, involving foreman Gonzales, dismissed by the ALO and reinstated by the Board.

First, Gonzales allegedly asked employee Augustine Rodriguez whether he had a UFW button. The employee testified he never wore a button but had one in his pocket, and in response to questioning said he had found it. Gonzales denied the conversation took place. Rodriguez testified to overhearing a conversation in which Gonzales said, "The union wasn't any good." He admitted not hearing the entire conversation, and it is not established which union was referred to. The Board found the charge established, on the basis of the "anti-union animus" expressed in the overheard statement, although the evidence conflicts as to whether the conversation even took place.

The other two incidents are: first, employee Reynaldo Bermea, who did some organizing work for the union, claimed Gonzales asked him whether fellow employee Berumen had a union organizing list. Next, employee Francisco Ortiz testified Gonzales told him Berumen could be sued for having such a list. The testimony of neither employee is very detailed or specific. There is no indication of coercive or intimidating effects on the organizing activities of either Bermea or Berumen, or of a serious threat to sue anyone. The Board found impermissible interrogation, based on its separate findings in this action of discriminatory layoff of Bermea and Berumen, to be discussed, as well as on its independent review of the evidence.

### C. Irrigator Foreman Charlie Figueroa/Employee Abelino Ortega

In one conversation, Figueroa asked Ortega his views on the UFW, which Ortega said he supported. Figueroa replied, "Well, if Chavez's union gets in, everything is going to get fucked up."

The conversation continued:

"He said, 'Right now you are holding one bird on your hand and you see many that are flying. Then you let the one you are holding go to get the ones that are flying, and at the end you are going to end up without nothing.'

"Q.   What did you understand that to be referring to?

"A.   With this I understood that he was telling me if I sympathized with the union I was going to end up without my job at Abatti."

The question whether this interchange was an exchange of opinions, protected free speech, or an intimidating threat of reprisal, was resolved by the Board: "These statements clearly constitute unlawful interrogation and a threat that supporting the UFW would cause the employee to lose benefits he already had."

### D.   Other Interrogations

For the sake of brevity the remaining interrogations declared impermissible by the Board are here discussed together. They include statements by sprinkler crew foreman Eddie Sanchez to employees Raul Jiminez and Miguel Lopez Chavez, and by lettuce crew foreman Fidel Quiroz to employee Rafael Ayon, as well as a statement by Agnes Poloni, sister of one of the Abatti brothers. In the case of the Sanchez crew, the Board found the relationships between foreman and "interrogated" employees were friendly. Both employees were superior workers. Sanchez in an amicable manner advised them not to wear indicia of UFW support in the presence of the Abatti brothers. In the lettuce crew, Quiroz made some vague predictions about what the Abattis might do if the UFW won the election, such as go back to Italy or stop planting crops. Again, the Board agrees Ayon was not intimidated by such statements. Similarly, Agnes Poloni, employed in the office, made remarks about a conversion to less labor intensive crops, such as alfalfa, if the union won. Citing *NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575 [23 L.Ed.2d 547, 89 S.Ct. 1918], the Board characterized all the foregoing statements "linking a possible union victory to loss of jobs . . . without supporting facts showing economic necessity" as impermissible threats of reprisal violating Labor Code section 1153, subdivision (a).

The charges of coercive threats or interrogation of employees present especially difficult considerations of competing interests. The First Amendment protects the expression of ideas, including the antiunion views of management, but the ALRA and the NLRA protect the rights of employees to choose a bargaining representative in a noncoercive atmosphere. The statutes specifically establish an employer's freedom of speech in this area unless he expresses "threat of reprisal or force, or promise of benefit." (Lab. Code, § 1155, patterned directly on 29 U.S.C.A. § 158(c).) ■ A mere prediction of what effect unionization would have is not necessarily an unfair labor practice (*NLRB* v. *Gissel Packing Co., supra,* 395 U.S. 575). "We look not for certain words that are allowed and others that are forbidden. Rather, we are to view the statements in their entirety and consider their total effect on the receiver. [Citations.]" (*N.L.R.B.* v. *Four Winds Industries, Inc.* (9th Cir. 1976) 530 F.2d 75, 78.)

The test is the effect of the speech in context (*Labor Board* v. *Virginia Power Co.* (1941) 314 U.S. 469 [86 L.Ed. 348, 62 S.Ct. 344]). The United States Supreme Court restated the test in *NLRB* v. *Gissel Packing Co., supra,* 395 U.S. 575, 617 to 618 [23 L.Ed.2d 547, 580]: "Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. Stating these obvious principles is but another way of recognizing that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk." From the many cases dealing with this problem subject we distill the following principle: The question whether employer statements are coercive in context is normally one peculiarly within the discretion of the agency, Board, because of its particular sensitivity to the effects of speech in the labor election context. Further, systematic, repeated or unambiguous threats of job loss and plant closing on account of a union victory are nearly always coercive, even

though isolated expressions of antiunion sentiment by lower level man-
agement employees are often permissible expressions of ideas.

██    Here the context of the interrogations, namely, a contested
union representation election in which the employer bitterly opposed the
union, is established and constitutes substantial evidence in support of
the Board findings of unlawful interrogation. (See *Labor Board* v.
*Link-Belt Co.* (1941) 311 U.S. 584, 599 [85 L.Ed. 368, 378-379, 61
S.Ct. 358].)

### IV.   Discriminatory Discharges/Refusals to Rehire

██    The Board upheld charges of discriminatory discharge or refusal
to rehire 13 of 14 employees. We review this portion of the order sub-
ject to these legal principles: The charging party has the burden of
proving a prima facie case of unlawful motive for discharge or refusal
to rehire, and if it does so, then the burden shifts to the employer to
show a legitimate business reason for the act (*Mt. Healthy City Board
of Ed.* v. *Doyle* (1977) 429 U.S. 274 [50 L.Ed.2d 471, 97 S.Ct. 568]).

As was said in *N.L.R.B.* v. *Eastern Smelting & Refining Corp.* (1st
Cir. 1979) 598 F.2d 666, 671: "We have put the *Mt. Healthy* principle
in the past in terms that, if the employer has established a good reason,
it is not to be charged unless its action would not have been taken 'but
for' the improper motivation, words now to be found in the penultimate
paragraph of the Court's recent opinion, following *Mt. Healthy*, in *Giv-
han* v. *Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693,
58 L.Ed.2d 619 (79). *Givhan* held the employer entitled to this defense
even though its improper motivation was the 'primary' one—an ad-
mitted reliance upon conduct which the Court found was constitution-
ally protected. However, using the *Mt. Healthy* and *Givhan* test, once
the Board has shown a 'significant' improper motivation, the burden is
on the employer to prove that it had a good reason, sufficient in itself,
to produce the discharge. *Id.*, 429 U.S. at 287, 97 S.Ct. 568."

### A.   Shovel Crew

Foreman Ramon Gonzales laid off 16 workers in late January 1976
due to seasonal work slowdown. The group included both union and
nonunion supporters, and included employees related to the foreman. In
selecting persons for layoff, Gonzales operated according to his memory

of who had seniority. After the layoff, the union charged Gonzales impermissibly refused to rehire six employees: Berumen, Bermea, Ortiz, Chavarria, Montoya and Rodriguez.

Berumen first worked at Abatti in 1971, with intermittent layoffs. He was a member of the UFW organizing committee for his crew, had a union bumper sticker on his car, wore a UFW button for several days and passed out leaflets and buttons at the gate just before the election. He is the employee who was the subject of Gonzales' alleged interrogation of Bermea, whether Berumen had a union organizing list. When laid off, he was allowed to keep some company tools. His testimony about reapplication efforts is four days after discharge, when work was probably not available, he applied and then "several times" at unspecified dates he claims he went to Gonzales' house to ask for work. He did not recall specifics of his applications in his testimony. Berumen testified he did not know if the company was aware of his union activity. Gonzales denied knowledge of union activity of any of his crew members and indicated he had little personal contact with them.

Chavarria was likewise on the organizing committee. He was first hired at Abatti in 1967. Gonzales claimed he laid off this employee on account of frequent absences. There was also some evidence Chavarria drank on the job, but Gonzales specifically said this fact was not the reason for the layoff. The testimony conflicts whether Chavarria wore a button and whether Gonzales knew of it. Chavarria admits he never reapplied for work, allegedly because he overheard Ben Abatti refuse work to Berumen and Ortiz, and therefore deemed it futile to apply. The Board refers to Chavarria's drinking on the job and states such reason for his discharge is pretextual since others drank in the field. In fact, it is irrelevant since this was not the reason given for his discharge. Also, the Board indicates another employee, Sixto Lopez, had a similar poor attendance record but was later rehired.

Bermea started work at Abatti in October 1974 and worked sporadically, holding other jobs elsewhere in 1974. His seniority was therefore low. He was on the UFW organizing committee and was the employee Gonzales allegedly asked about Berumen's organizing list. He testified, as did Chavarria, Gonzales saw them signing UFW authorization cards. He claims he wore a button on his hat one day. Three months elapsed between the day he signed the authorization card, November 4, 1975, and his layoff in January. Like Berumen, he apparently kept some com-

pany tools with permission on layoff. He admittedly found another job from April to June 1976. He did testify he reapplied at Abatti and was told he was suspended.

Augustine Rodriguez first worked at Abatti in the Figueroa crew from 1970 to 1972. He was hired in the shovel crew in January 1976 just before the layoff and had minimal seniority. He accepted leaflets and hid a UFW button in his pocket. He claims he asked about work some seven times in the three weeks after his discharge and may have asked again in about six months.

Montoya had worked for Abatti on and off since 1967 and had also worked for other companies, including Saikhon from June to September 1975. He joined the shovel crew at Abatti in late September 1975. He took leaflets and sometimes wore a UFW button. Because he rode to work with Gonzales, the Board discredited all of Gonzales' testimony he had no knowledge of union sympathies of his crew members.

Francisco Ortiz, another organizing committee member, passed out leaflets twice and wore a button. He gave contradictory testimony, first denying, later admitting he was reinstated in melon work in May 1976. He had worked for Abatti five years. His testimony about reapplication efforts was he asked for work once the week of the layoff and then "kept trying." He was, in fact, rehired.

## B. Sprinkler Crew

This charge involves sprinkler crew foreman Eddie Sanchez and two employees, Raul Jiminez and Miguel Lopez Chavez, laid off January 21, 1976. These employees were good workers who had received bonuses in the past. Their overall relations with the foreman were friendly. Jiminez testified although he differed with Sanchez about the union they had a good relationship. Jiminez had admitted low seniority in the crew since September 1975, and Chavez had worked since October 1975. The layoff of both was due to a work slowdown and not discriminatory. However, Jiminez filed an unfair labor practice charge against Abatti after the layoff, and now claims he was not rehired because of filing the charge.

Chavez never reapplied for work, claiming he heard Jiminez was refused work and therefore thought it useless to apply. Jiminez testified he asked for work in September 1976 and Sanchez told him the crew

was full. Sanchez essentially corroborates this testimony, although there is some ambiguity about whether Jiminez asked for a job in so many words. The Board states payroll records indicate hiring of employees in the Sanchez crew in late September and early October and relies on this evidence to indicate work availability when Jiminez applied. The payroll records could also be viewed as evidence corroborating Sanchez' statement to Jiminez the crew was full. The Board decision itself indicates there is doubt whether work was available when Jiminez applied. Also, the evidence conflicts whether other work at Abatti, specifically, work in rapini, was available at time of initial layoff and whether Sanchez had some obligation to refer Jiminez and Chavez to the other crew. Here Sanchez testified such work existed and he offered it to them, but Jiminez and Chavez testified no work was offered.

Both discriminatees were visible UFW supporters. They wore buttons and Jiminez yelled, "viva Chavez" on occasion.

### C. Irrigator Crew

Irrigator foreman Charlie Figueroa laid off employee Abelino Ortega allegedly because he wasted water and was frequently absent. Ortega had been with the Abattis since 1973, but missed seven months in 1975 due to illness. He had a UFW bumper sticker on his car, which he parked off the premises; he passed out leaflets *after* his discharge (which occurred two days before the election) and was apparently a strong union supporter. Although Figueroa denied knowing of his union sympathies, the circumstantial evidence of his knowledge is quite strong. Ortega is the employee to whom Figueroa expressed his views about the UFW, discussed above under the heading "interrogation." Further, an irrigator had not been fired in the Figueroa crew for 15 years for spilling water.

### D. Tractor Crew

Here is charged the alleged discriminatory discharge of tractor driver Isidoro Prieto by foreman Albert Studer. Prieto started work at Abatti in August 1974. His union activity consisted of willingness to speak to organizers and take leaflets. He admitted deafness, making it hard for him to hear instructions in the field, and had problems falling asleep on his night driving shift. He fell asleep frequently and drove dangerously, weaving in the fields. Further, he was so secretive about his union sup-

port he admits nobody may have known of it. In finding discriminatory discharge, the Board relied on the timing of the discharge, which took place January 24, 1976, two days before the election, and the fact his work habits had been tolerated without complaint for a year and a half.

### E. Weeding and Thinning Crew

Here the Board found foreman Jose Rios discriminatorily laid off and refused to rehire Jesus and Elena Solano and Herlinda Avitua, who were among 10 employees laid off January 31, 1976, on account of an alleged work slowdown.

Rios knew the Solanos were active, open UFW supporters when he hired them, according to the testimony of Jesus Solano. Rios claims they were selected for layoff because of low seniority in the case of Jesus and frequent absences in Elena's case. They started work in October 1975. Elena missed five weeks of work in November to December 1975. The evidence indicates a friendship, or at least mutual respect, between Rios and Jesus, dating back to 1968, but Rios was apparently unfriendly towards Elena. Jesus testified his discussions about the union with Rios were friendly ones. Both were laid off after the election.

Regarding evidence of application for rehire, Rios testified he told laid-off employees to check at his house about availability of work. Some did and were hired. Jesus and Elena testified Rios told them he would call them and never did, and neither reapplied.

The evidence is ambiguous as to the motive for the layoff of Jesus, and conflicting as to whether failure to apply for work was justifiably based on a promise of recall. As to Elena, the evidence is ambiguous. The motivation for her discharge could be her absences or the added factor of Rios' apparently personal dislike of her.

Herlinda Avitua was apparently friendly with both Rios and Elena Solano, but after the election she claims Rios became unfriendly towards her. As discussed above under "interrogation," she testified her conversations with Rios about the union were casual and friendly in nature, not intimidating, and she was not laid off until after the election. She had admitted low seniority in the crew and according to Rios was not a particularly good worker. She admits she never reapplied for work.

The testimony of Elena Solano, who overheard most of the alleged interrogations, corroborates other evidence showing Rios and Avitua were friends, as well as corroborating the existence of friendship between Jesus Solano and Rios.

### F. Pattern of Discrimination

Here the layoffs and the inability of the alleged discriminatees to find their way back into the Abatti workforce occurred after a bitterly contested union election during which the employer committed such unfair labor practices as denials of access to the union and procuring the arrest of organizers. Against this background, 13 union activists were discharged from the workforce, constituting slightly more than 50 percent of the total employees then laid off. The nonunion workers laid off resecured positions at Abatti but the discriminatees did not (with one exception). Further, 11 of the 13 laid off were the organizing committee in their crews and the only UFW supporters, and all had displayed some union support. Further, with the exception of Avitua and Prieto, the discriminatees were admittedly good workers. The charge of "wasting water" against Ortega was obviously pretext.

### G. Conclusion

We conclude the Board findings of impermissible discharge or refusal to rehire are entitled to enforcement. The evidence of wrongful motive is circumstantial, but sufficient. We may not substitute our judgment for that of the Board in its area of special expertise, the assessment of the weight of circumstantial evidence in context.

The Board order is modified by deleting the finding of impermissible surveillance. As modified it is affirmed and will be entitled to enforcement. The cause is returned to the Board for redetermination of the appropriate remedy, if deemed suitable, in light of the change in the order; for back pay proceedings; and for any other proceedings deemed necessary. Neither party shall have costs on this appeal.

STANIFORTH, J.—I concur with the sound law, reasoning and conclusion expressed by Presiding Justice Brown but would add these further supportive observations.

I

Where we are asked to overturn a final order based upon the factual finding of the Agricultural Labor Relations Board (Board) the appeal court's task commences with the recognition of but one fundamental standard for appellate court review. Our power to review factual findings of the Board is limited. Such findings are "conclusive" if supported by substantial evidence "on the record considered as a whole." (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343 [156 Cal.Rptr. 1, 595 P.2d 579]; *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456, 464]; *N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc.* (9th Cir. 1978) 572.F.2d 1343, 1347; *N.L.R.B.* v. *Warren L. Rose Castings, Inc.* (9th Cir. 1978) 587 F.2d 1005, 1008.) "[I]f there is evidence to support each of two conflicting views, the findings of the Board must be allowed to stand despite the fact that we might have reached the opposite conclusion on our own. [Citations.]" (*N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc., supra*, 572 F.2d 1343, 1347.) We must start with the finding made by the Board and accept it if it is supported by substantial evidence. (*N.L.R.B.* v. *Miller Redwood Company* (9th Cir. 1969) 407 F.2d 1366, 1369.)

The Grower (Abatti) contends the discharges here challenged were not for union activities, but because of valid business reasons. In such factual circumstance, it was the province of the Board to decide on conflicting evidence the employer's motivation. (*United States Rubber Company* v. *N.L.R.B.* (5th Cir. 1967) 384 F.2d 660, 663; *N.L.R.B.* v. *Ayer Lar Sanitarium* (9th Cir. 1970) 436 F.2d 45, 49.) Where, as here, the employer's motive is the central issue, the fact finder must often rely heavily on circumstantial evidence and inferences. Only rarely will there be probative direct evidence of the employer's motivation. (*Shattuck Denn Mining Corp.* (*Iron King Branch*) v. *N.L.R.B.* (9th Cir. 1966) 362 F.2d 466.) It is a well-established rule that in such cases the Board is free to draw inferences from all the circumstances and need not accept self-serving declarations of intent, even if they are uncontradicted. (*N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc., supra; Shattuck Denn Mining Corp.* (*Iron King Branch*) v. *N.L.R.B., supra; N.L.R.B.* v. *Warren L. Rose Castings Inc., supra.*)

This further corollary is applicable in discriminatory discharge/hire cases: "[T]he cases are legion that the existence of a justifiable ground

for discharge will not prevent such discharge from being an unfair labor practice if partially motivated by the employee's protected activity; a business reason cannot be used as a pretext for a discriminatory firing. [Citations.] The test is whether the business reason or the protected union activity is the moving cause behind the discharge. [Citations.] In other words, would this employee have been discharged *but for* his union activity? [Citation.]" (*N.L.R.B.* v. *Ayer Lar Sanitarium, supra,* 436 F.2d 45, 50.)

By this test, whether the protected union activity is the "dominant motive" is not relevant. Thus the appeal court does not delve into metaphysics or the litigant's psyche in search of a "dominant motive" but rather the Board must meet its burden of demonstrating a "prima facie," or "significant" improper motivation by substantial evidence. The matter may not end there, for the employer may defend by proving that there was a valid "business" reason for the discharge and that "it would have reached the same decision...even in the absence of the protected conduct." (*Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 484, 97 S.Ct. 568, 576].) The burden of proof on this issue is on the employer, not the Board.

As was said in *N.L.R.B.* v. *Eastern Smelting & Refining Corp.* (1st Cir. 1979) 598 F.2d 666, 671: "We have put the *Mt. Healthy* principle in the past in terms that, if the employer has established a good reason, it is not to be charged unless its action would not have been taken 'but for' the improper motivation, words now to be found in the penultimate paragraph of the Court's recent opinion, following *Mt. Healthy*, in *Givhan* v. *Western Line Consol. School Dist....*99 S.Ct. 693,....*Givhan* held the employer entitled to this defense even though its improper motivation was the 'primary' one—an admitted reliance upon conduct which the Court found was constitutionally protected. However, using the *Mt. Healthy* and *Givhan* test, once the Board has shown a 'significant' improper motivation, the burden is on the employer to prove that it had a good reason, sufficient in itself, to produce the discharge. [Citation.]" (Fns. omitted.)

The ninth circuit (*N.L.R.B.* v. *Central Press of California* (9th Cir. 1975) 527 F.2d 1156, 1158) has articulated this correct procedure: "The Board noted that the general counsel had established a prima facie case of an unfair labor practice. It then said that such a case can be 'overcome only by a preponderance of competent, credible rebutting

evidence. But respondent has not sustained its burden of going forward to adduce such proof.' [Citation.]

"..  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Moreover, even if we were unsure whether the Board considered this assertion, we would enforce the order because the Board found that anti-union sentiment had at least partially motivated the discharge. This finding is supported by substantial evidence and we will not disturb it. [Citations.] . . . .

"This court has said in a similar situation: [A]lthough justifiable grounds may abound, a discharge is unlawful even if it is '*partially* motivated by the employee's protected activity . . . .' [Citation.]"

## II

Nor does disagreement between the ALO and the Board change the rule. In *N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc., supra*, 572 F.2d 1343, 1347, the court stated: "The company, to maximize the weight of the Administrative Law Judge's refusal to find a failure to bargain, argues that there is no evidence to support the Board's overruling of his recommendation. However, this is an incorrect formulation of the issue. The standard of review does not change simply because the Board has disagreed with the Administrative Law Judge. [Citation.] We must still start with the finding made by the Board and accept it if it is supported by substantial evidence. [Citation.]

"The Board is free to draw its own inferences from the evidence available to it. Thus, if the Board can point to evidence which supports its inference, courts have allowed the Board's finding to stand despite the fact that the Administrative Law Judge interpreted the facts contrary to the inference drawn. [Citations.]"

The statutorily mandated deference to findings of fact "runs in favor of the Board, not in favor of the initial trier-of-facts, the administrative law judge." (*Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, 1076.)

## III

Nor does the rule change because the ALO findings are based upon testimonial demeanor. In *Universal Camera Corp.* v. *Labor Bd., supra,*

340 U.S. 474, 496 [95 L.Ed. 456, 472], the Supreme Court said: "The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case."

In *Penasquitos Village, Inc.* v. *N.L.R.B., supra*, 565 F.2d 1074, 1079, Judge Wallace stated: "[W]e do not hold that the administrative law judge's determinations of credibility based on demeanor are conclusive on the Board. Many circuits, including ours, have held that they are not. [Citations.] We simply observe that the special deference deservedly afforded the administrative law judge's factual determinations based on testimonial inferences will weigh heavily in our review of a contrary finding by the Board."

Judge Duniway "dissented"[1] in *Penasquitos Village, Inc., supra*, observing (pp. 1084-1085): "The notion that special deference is owed to the determination of a trier of fact, whether judge, trial examiner, hearing officer ('administrative law judge'), or jury, because the trier 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records,' [citation], is deeply imbedded in the law. There must be thousands of appellate decisions that state and restate it in an infinite variety of ways. I could not disregard it if I would; indeed, I have no desire to do so. As a generalization, it is unassailable.

"      .      .      .      .      .      .      .      .      .      .      .      .      .      .

"[I]nnumerable cases. . .state and restate the importance of a witness's demeanor to the trier of fact, there are very few that deal with the proper effect of this or that aspect of demeanor. Those that I can find tend to confirm my view that myth and folklore are involved."

A most succinct analysis of the evidentiary position occupied by demeanor-based credibility findings was expressed by Judge Merrill in *Carbo* v. *United States* (9th Cir. 1963) 314 F.2d 718, 749: "Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence."

---

[1]Concurred in by Judge Choy, thus making it the majority view on this specific point of law.

I would join Judge Choy in concurring with Judge Duniway's "eloquent exposition" (*Penasquitos Village, Inc.* v. *N.L.R.B., supra*, 565 F.2d 1074, 1084-1085) where he said: "I am convinced, both from experience as a trial lawyer and from experience as an appellate judge, that much that is thought and said about the trier of fact as a lie detector is myth or folklore. Every trial lawyer knows, and most trial judges will admit, that it is not unusual for an accomplished liar to fool a jury (or, even, heaven forbid, a trial judge) into believing him because his demeanor is so convincing. The expression of his countenance may be open and frank; he may sit squarely in the chair, with no squirming; he may show no nervousness; his answers to questions may be clear, concise and audible, and given without hesitation; his coloration may be normal—neither pale nor flushed. In short, he may appear to be the trial lawyer's ideal witness. He may also be a consummate liar. In such a case, the fact finder may fit Iago's description of Othello:

"The Moor is of a free and open nature, That thinks men honest that but seem to be so; And will as tenderly be led by the nose as asses are. (Othello, Act 1, Sc. 3, 1.405-8)

"On the other hand, another fact finder seeing and hearing the same witness may conclude that he is just too good a testifier, that he is an expert actor, and that he is also a liar."

Labor Code section 1160.3 provides in part: "If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has [or has not] engaged in or is [or is not] engaging in any such unfair labor practice, the board shall state its finding of fact. . . ." This statutory responsibility for decision placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are "'clearly erroneous.'" (See *Penasquitos Village, Inc., supra*, 565 F.2d 1074, 1087.) The final word was said by Judge Lumbard in *N.L.R.B.* v. *Interboro Contractors, Inc.* (2d Cir. 1967) 388 F.2d 495, 499: "While the standard set forth in *Universal Camera* is imprecise, 'it provides as much clarity as the area affords.'"

I would conclude that the Board should have, and does have, more leeway in making its own findings, and in rejecting findings of its trial examiners, than we have in reviewing the Board's findings or those of a trial judge or jury. (See *Universal Camera Corp.* v. *Labor Bd., supra*, 340 U.S. 474, 492 [95 L.Ed. 456, 469].)

## IV

The faithful application of the foregoing rules require:

(A)  I concur with Presiding Justice Brown's affirmation of the Board's finding of wrongful denial of access.

(B)  I concur with the refusal of enforcement of the Board's order finding impermissible surveillance by security guard Kile. I cannot find in the entire record "relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*Edison Co.* v. *Labor Bd.* (1938) 305 U.S. 197, 229 [83 L.Ed. 126, 140, 59 S.Ct. 206, 217]) that Kile was in fact "surveilling" anyone as that term is commonly understood and defined. (See Webster's Third New Internat. Dict., p. 2302.)

(C)  I concur with the affirmation of the Board's finding of impermissible interrogation of employees Herlinda Avitua, Rodriguez, Bermea and Berumen.

It is an unfair labor practice for the employer "[t]o interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152." (Lab. Code, § 1153, subd. (a).) Labor Code section 1152 grants agricultural employees the "right to self-organization, to form, join or assist labor organizations. . . ." But expressions, opinions and their dissemination "[should] not constitute evidence of an unfair labor practice. . .if such expression contains *no threat of reprisal or force, or promise of benefit.*" (Lab. Code, § 1155; italics added.)

The test on appellate review is whether substantial evidence supports the Board's finding that the employer interrogation or expression contained a threat of reprisal and reasonably tended to restrain or interfere with the employees in the exercise of their protected rights. (*Amalgamated Meat Cutters, etc., Local No. 364* v. *N.L.R.B.* (9th Cir. 1970) 435 F.2d 668, 669; *Hughes & Hatcher, Inc.* v. *N.L.R.B.* (6th Cir. 1968) 393 F.2d 557, 562-563; *Dieckbrader Express, Inc.*, 168 N.L.R.B. 867, 869 (1967); *Frito-Lay, Inc.*, 151 N.L.R.B. 28, 34 (1965); *Penasquitos Village, Inc.* v. *N.L.R.B., supra*, 565 F.2d 1074, 1080.)

In applying the foregoing rules, the Board relied upon the instructive reasoning of *Blue Flash Express, Inc.*, 109 N.L.R.B. 591 (1954). There

the National Labor Relations Board (NLRB) weighed certain factors to determine whether employer interrogation was coercive under all the circumstances of the particular case. These factors included (a) whether the employer communicated to employees a legitimate purpose for the questioning, (b) gave assurances that no reprisal would take place, and (c) did the questioning occur in a background free of employer hostility to union organization. The NLRB in *Blue Flash* further noted that it would consider (d) the timing of questioning, (e) the nature of the information sought, (f) the truthfulness of an employee's answer, and (g) the relationship of the personnel involved. (*Blue Flash Express, Inc., supra*, at p. 594.) The "Blue Flash" criteria has been approved by the courts. (See *Bon-R-Reproductions, Inc.* v. *N.L.R.B.* (2d Cir. 1962) 309 F.2d 898, 904; *N.L.R.B.* v. *Historic Smithville Inn* (3d Cir. 1969) 414 F.2d 1358, 1362.) The ninth circuit has applied "Blue Flash" factors holding express reassurance by an employer of no retaliation or a history of free and open discussion of union activities without reprisal might in some circumstances preclude a finding of coerciveness. (*Penasquitos Village, Inc.* v. *N.L.R.B., supra*, 565 F.2d 1074, 1080.)

Further, whether certain words do contain a threat of reprisal and would reasonably tend to restrain or interfere with an employee's exercise of a protected right is a matter that calls for some detailed understanding of the agricultural labor scene, the peculiar relationship between a field laborer and supervisor with power to hire and fire the non-English speaking agricultural migrant laborers, as well as the nature of the symbols used to communicate. These questions presented to the Board were of such nature as to call for expertise. Presumptively the Board is equipped or informed by experience to deal with this specialized field of knowledge; therefore their findings carry the authority of an experience which the courts do not possess and therefore must respect. (*Universal Camera Corp.* v. *Labor Bd., supra*, 340 U.S. 474, 488 [95 L.Ed. 456, 467].)

There are three incidents of coercive interrogation involving Herlinda Avitua. As to the first, where Rios interrogated Avitua about her signing of a UFW authorization card, the employer (contrary to its general legal stance) argues the ALO should be reversed even though his crediting of Avitua was explicitly based on witness demeanor. The Board in its findings deferred to the ALO's credibility resolution.

Next the Board reversed the ALO's finding as to the second incident in which Rios interrogated Avitua about her vote. The ALO had in fact

overlooked testimony by Avitua that this had occurred. The Board based its finding upon her testimony and the ALO's general crediting of her as a witness plus the corroborating testimony of Elena Solano.

The employer's primary argument as to the third incident in which supervisor Rios directed Avitua to remove a UFW button is that the statement was not coercive, and therefore not unlawful. The employer relies upon Avitua's testimony that she was not intimidated herself by the statement and that she continued to wear the button for several days thereafter. Such evidence may be relevant in some circumstances but is not controlling. (*Blue Flash Express, Inc., supra,* 109 N.L.R.B. 591.)

Furthermore, *the test as established by NLRB precedent is not whether the employees were actually intimidated but whether the employer engaged in conduct which may reasonably be said tended to interfere with the free exercise of the employee's rights.* (*Labor Board v. Link-Belt Co.* (1941) 311 U.S. 584, 599 [85 L.Ed. 368, 378-379, 61 S.Ct. 358].) Finally the employer argues the questioning of Avitua was "amicable," noncoercive; the employer's action—a discriminatory firing of Avitua—speaks much louder than words. The Board found that in all the circumstances of this case, the amicable nature of the conversation was not relevant since other factors made the statement coercive.

Next, the Board's finding of coercive interrogation is supported by the direct evidence from the three employees, Rodriguez, Bermea and Berumen, as well as corroborating testimony from Ortiz. Supervisor Gonzales told Ortiz that a reprisal—firing—was possible against Bermea for his keeping the union membership list. The Board considered the undisputed factual matrix in which the foregoing statements were made. The union was attempting to organize the Growers' workforce. To say the Grower did not approve is to grossly understate the quality and intensity of the Growers' negative response. The charged coercive interrogation occurred shortly before and during the hotly contested first union representation election.

The Growers' antipathy to the unionization was expressed in a whole series of incidents from which the Board found a pattern of discrimination. This included evidence of multiple attempts by the Grower to intimidate and coerce steady employees against unionization by interrogation, threats of reprisal, denials of access, procuring arrest of organizers, and ultimately the firing of union leaders. Thirteen union

activist employees were discharged from the Growers' workforce shortly before or after this first representation election conducted at Abattis' ranch; eleven of the thirteen were the organizing committee members in their crews and the only UFW supporters. The remaining two had on occasion openly displayed their support for the union. Eight of the thirteen testified to their being interrogated, threatened with reprisal, or being the recipients of other coercive statements. Statistically, the union supporters fired constituted slightly more than 50 percent of the employees laid off, whereas the total number laid off was between 20 and 25 percent of petitioner's steady workforce. Virtually every other non-union employee laid off at the same time found his or her way back into the Growers' workforce, while only one union supporter did and in other work than that from which he was laid off and with a supervisor's stated hope that his boss would not find out.

The employer offered no evidence of any express reassurance against reprisal. On the contrary, supervisor Gonzalez used language that can be reasonably interpreted as threatened retaliation for UFW support. The Growers did in fact carry out that threat—discharged 13 union supporters. Furthermore, the Abatti-UFW history was not one of free and open discussion but rather bitter contest over unionization of its employees. Each of these employees were interrogated (or threatened with reprisal) by their immediate supervisors who had the power to hire and fire and that interrogations coincided with a union organization campaign. In some cases, *employees gave false answers to protect themselves.* No reason, legitimate or otherwise, was ever given for the information sought. Thus *every "Blue Flash" evidentiary factor was here present.* This web of circumstantial evidence tended to refute the Grower's contention of noncoercive questioning and constitutes substantial evidence which supports the conclusions of the Board.

In these circumstances to overturn the Board's decision is to substitute our judgment on weight of evidence for that of the Board. The "flavor" of their conversations is a matter peculiarly for the Board's evaluation, not ours. There is no lack of substantial evidence—when the record is viewed as a whole—to support the Board's determination.

(D)   I concur with the affirmance of the Board's findings of coercive interrogations by supervisor Figueroa of employee Abelino Ortega. The language used is undisputed as well as was Ortega's perception of the albeit allegorical ("bird in your hand"), yet coercive words as a threat

of loss of his job. While the language used may be ambiguous or allegorical when viewed in restrospect from this happy estate of labor peace, yet the Board viewed it in the context of Figueroa's known dislike for the union, of interrogation and threats of reprisal in other steady crews; its timing was just before the representational election; and most significantly it followed Figueroa's eavesdropping on Ortega's conversation with another employee and his subsequent interrogation of Ortega about his union views. Ortega's testimony is explicit: he thought the story meant that if he supported the UFW he would end up with no job at Abatti. Such remarks must be viewed in the context of a union campaign. (*N.L.R.B.* v. *Tru-Line Metal Products Company* (6th Cir. 1963) 324 F.2d 614, 616.) When made during a period when unionization of employees is sought, management statements to employees that it might be necessary to close a plant if the union gets in, are coercive, notwithstanding a sincere belief that such will occur. (*Ibid.*, citing *United Fireworks Mfg. Co.* v. *N.L.R.B.* (6th Cir. 1958) 252 F.2d 428, 430.)

Substantial evidence, direct and circumstantial, support the Board's decision.

(E) I concur in enforcing the Board's finding of illegal interrogation of employees Jiminez, Chavez and Ayon. Foreman Sanchez told Jiminez not to wear a UFW button into the shop because he would get in trouble with Ben Abatti. It is argued this was merely a friendly suggestion and Jiminez was not intimidated. Jiminez stated he was not intimidated by the Abatti antiunion position, yet it is uncontradicted that he removed the button after Sanchez' statement and did not wear it to the shop again.

The next incident occurred when foreman Sanchez told Chavez that Ben Abatti had told irrigator foreman Figueroa that he knew the UFW leaders in the crew and that Figueroa was not to give them work. Such words are "operative facts," do not come under the hearsay exclusion and were properly considered by the Board.

Whether Ben Abatti in fact uttered such words is not relevant to the charge of coercive interrogation. What is significant is that foreman Sanchez made the statement and in the context where the statement itself would reasonably tend to convey the message to Chavez that similar orders would be given to Sanchez if UFW support surfaced among his crew members. Chavez was in fact laid off, refused referral to other available jobs and rehire.

With respect to supervisor Quiroz' admission of a conversation with employee Ayon in which he stated if the Abattis did not want to sign with the UFW, they could just quit planting. In the context of an upcoming representation election, the unmistakable message was that Ayon should abandon support for the UFW or risk the elimination of his job. Such threats of reprisal are coercive and a violation of employee rights under the Agricultural Labor Relations Act (Act). (See *N.L.R.B.* v. *Tru-Line Metal Products Company, supra*, 324 F.2d 614.)

Finally, there was the second not too subtle threat of loss of job made to Ayon when the Abattis' secretary-treasurer stated (when she saw Ayon's UFW button) Abatti would shift to less labor intensive crops in the event of a UFW victory. The words used by the Abatti official are uncontradicted. Again, the totality of circumstances, events occurring at this time added to the words used, supply substantial evidence supporting the Board's determination. It is urged that the statements were made in a "friendly" atmosphere. The denial of access to, arrest of union organizers, the threat of loss of job, followed by firing, refusal to refer to other available jobs or rehire 14 union activists belie any "friendly" cast upon these words.

The dissenting opinion voices a responsibility to protect First Amendment freedom. I echo, support such a concern and duty. However, to recite the conceded premise that any employer or employee has the freedom of speech guaranteed by the First Amendment is but to avoid the real issue here.

The true question is not whether any employer has a fundamental constitutionally protected right of free speech—he has—but rather did the employer's expression contain a "threat of reprisal." This is a factual question whose answer rests here in much evidence and expert appraisal. "Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. *Thus, an employer's [First Amendment] rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) [of the Act]....*" (*NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575, 617 [23 L.Ed.2d 547, 580, 89 S.Ct. 1918, 1942] italics added.)

The recited wealth of direct and circumstantial evidence supports the Board's conclusion. Freedom of speech does not authorize either gross or subtle employee coercion.

(F)   Finally I concur with the enforcement of the Board's order reinstating 13 of the 14 union activists fired. Presiding Justice Brown has succinctly reviewed the evidence and substantiated the Board's finding of discriminatory firing and refusal to rehire.

A 59-page decision of the Board documents *its* own credibility findings with a detailed factual summary and a thoughtful evaluative analysis of the evidence presented on the entire record. Such decision carries its own badges of reliability.

I concur in the enforcement of the Board's order reinstating the 13 discharged workers.

**COLOGNE, J.,** Concurring and Dissenting:—I concur with the majority in affirming the Board's finding of the employer's wrongful denial of access and the order permitting access. I also concur in the conclusion of the majority there is no evidence of "surveillance" as that term is normally understood. As to the balance of the opinion, I would apply the applicable law to the charges of illegal interrogation and discrimination on an individual basis, carrying out the view that "*we* are to view the statements in their entirety and consider their total effect on the receiver" (*N.L.R.B.* v. *Four Winds Industries, Inc.* (9th Cir. 1976) 530 F.2d 75, 78; italics added). The majority, instead, defers to the particular sensitivity of the Board which sits with no more before it than we have—a transcript of testimony before the ALO.

The standard of review is whether the Board's conclusions are supported by substantial evidence based on the record as a whole (Lab. Code, § 1160.8; *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474 [95 L.Ed. 456, 71 S.Ct. 456]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]). This review, however, is subject to the cautionary instruction given us by the Supreme Court in *Universal Camera, supra*, at page 490 [95 L.Ed. at pp. 468-469]: "[C]ourts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the re-

cord as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. *The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.*" (Italics added.) The freedom with which the Board may act is always subject to constraints imposed by the Constitution as well as the statutes. "[The Supreme Court] has recognized that 'in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.... Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.' [Citations.] The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly. [Citation.]" (*Thomas* v. *Collins* (1945) 323 U.S. 516, 532 [89 L.Ed. 430, 441, 65 S.Ct. 315, 323-324].)

It has been made clear that both the union and the employer have the right in a labor dispute to express opinions, and that right extends to more than abstract discussion, unrelated to action. Free trade in ideas was envisioned by the framers of the Bill of Rights, as well as free trade in the opportunity to persuade to action, not merely to describe facts. Accordingly, the employer's attempts to persuade persons not to join the union must be as unfettered as the union's attempt to persuade to action with respect to joining. These discussions are within the First Amendment guaranty (*Labor Bd.* v. *Virginia Power Co.* (1941) 314 U.S. 469 [86 L.Ed. 348, 62 S.Ct. 344]; *Southwire Company* v. *N.L.R.B.* (5th Cir. 1967) 383 F.2d 235, 240-241).

The constitutional right is not without limitations. The law envisions free and open discussions in labor relations, including opinions as to the advantages and disadvantages of unions. It is the employee who must make the ultimate choice and he must be free of coercion by threats of reprisal or force or promise of benefit (Lab. Code, §§ 1153, 1154). It is not intended the Board or this court should act as censor of the reasonableness of the statements or consider the merit of competing propaganda (*Luxuray of N.Y., Div. of Beaunit Corp.* v. *National Lab. Rel.*

*Bd.* (2d Cir. 1971) 447 F.2d 112, 117). This constitutional right of expressing one's views, opinions and arguments, together with its limitations, is specially provided for in the Agricultural Labor Relations Act. Labor Code section 1155 reads: "The expressing of any views, arguments, or opinions, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute evidence of an unfair labor practice under the provisions of this part, if such expression contains no threat of reprisal or force, or promise of benefit."

There is a fine line between what is a "threat" and what is a "prediction." The former is not privileged, the latter is (*Southwire Company* v. *N.L.R.B., supra*, 383 F.2d 235, 241). Unless the speech contains a "threat of reprisal or force of promise of benefit," it is privileged. A mere prediction of what effect unionization would have on the company is not an unfair labor practice (*NLRB* v. *Gissel Packing Co.*, 395 U.S. 575, 618 [23 L.Ed.2d 547, 580, 89 S.Ct. 1918, 1942]). An employer is free to tell the employees "'what he reasonably believes will be the likely economic consequences of unionization that are outside his control'" and not "'threats of economic reprisal to be taken solely on his own volition.' [Citations.]" (*NLRB* v. *Gissel Packing Co., supra*, 395 U.S. at p. 619 [23 L.Ed.2d at p. 581, 89 S.Ct. at p. 1942]).[1]

In analyzing the statements of the employer, we must look not for certain words, but rather, view the statements in their entirety and consider their total effect on the receiver (*Gissel, supra*, 395 U.S. at p. 619 [23 L.Ed.2d at p. 581]; *N.L.R.B.* v. *Tommy's Spanish Foods, Inc.* (9th Cir. 1972) 463 F.2d 116). The test was restated by the Supreme Court and cited by the majority. Whether the statements are to be viewed one way or the other is a matter left to the Board, giving appropriate weight

---

[1] In *NLRB* v. *Gissel, supra*, the employer told his workers the company was in a precarious financial condition and the strike-hungry union would make unreasonable demands causing the plant to shut down and they would all be out of work. The court there held the statements were without support since no demand had been made by the union, there was no basis for assuming the union would have to strike to be heard and no evidence showed other plant closings were due to unionism. They were coercive threats. It said:

"[A]n employer, who has control over that relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in "'brinkmanship'" when it becomes all too easy to 'overstep and tumble [over] the brink,' *Wausau Steel Corp.* v. *NLRB*, 377 F.2d 369, 372 (C.A. 7th Cir. 1967). At the least he can avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees." (*NLRB* v. *Gissel Packing Co., supra*, at p. 620 [23 L.Ed.2d at p. 582, 89 S.Ct. at p. 1943].)

to the ALO's determinations,[2] but protection of First Amendment rights is within the particular province of the courts to protect and defend and we should not abdicate our responsibility in that regard on the simplistic rationale that substantial evidence supports a conclusion of coercion by the Board.

In reviewing these cases, I do not attempt to repeat the facts since the majority has accurately stated them in considerable detail. I believe it is essential to review those cases where I see error in the Board's conclusion.

*Illegal Interrogations and Threats.*

*A. Supervisor Jose Rios and Employee Herlinda Avitua*

The record reveals a conversation between Rios and Avitua where Rios asked her if she had signed the authorization card and said she should not have done that. This conversation cannot be excised from the setting of a friendly and close relationship. Avitua specifically testified the conversations were friendly (she was a close friend of Rios and his daughter) and she was not intimidated by the questioning. How can a Board reject the credibility of the claimant on such a vital issue as this, the subjective effect of statements? That effect could not better be stated than by the employee herself. The Board found it irrelevant Avitua

---

[2]After hearing the evidence, the administrative law officer dismissed 14 of the claims. The Board reinstated all but one of these claims. This disparity concerns me. As stated in *Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, 1078-1079, the court said:

"Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records.' [Citations.] All aspects of the witness's demeanor—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript, such as the Board or the Court of Appeals. . . ."

When the Board chooses to disregard the factual findings of its hearing officer, I believe our burden on review is to that extent increased and we are bound to scrutinize the Board's findings more carefully in light of the absence of underlying factual findings by the ALO (see *N.L.R.B.* v. *Four Winds Industries, supra,* 530 F.2d 75, 80; *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 318-319 [90 Cal.Rptr. 355, 475 P.2d 451]). Even so, that rule remains; the Board is entitled to reject the hearing officer's findings on credibility if substantial evidence supports contrary findings.

was not actually intimidated because in its view such questioning per se tends to interfere with free expression.

The Board held that while interrogation is not a per se violation of the act, it does constitute a violation when it tends to coerce, restrain or interfere with the employee's free exercise of rights under the act. It held it was irrelevant whether Avitua was in fact intimidated. The test whether the questioning tends to be coercive, though not wholly dependent on the employee's being in fact coerced, must include a number of factors. "(1) The history of the employer's conduct and attitude towards its employees; (2) the nature of the information sought—for example, did the interrogator appear to be seeking information on which to base action against individual employees; (3) the position or office of the interrogator in the company's hierarchy; (4) the place and method of interrogation—was the employee summoned to the boss' office, or was there an atmosphere of 'unnatural formality?'; and (5) truthfulness of the reply." (*N.L.R.B.* v. *Huntsville Manufacturing Co.* (5th Cir. 1975) 514 F.2d 723, 724.) While there is evidence of the employer's antiunion animus, there was at that time no evidence to support a showing the interrogation was related to any of these factors. Rios was not hostile, the information was solicited to properly advise Avitua, not to be used against her; Rios was low in the company hierarchy; the setting was informal and the answers were a truthful admission of having signed the organizational card. Under these circumstances, especially in light of the ALO's finding, I believe the Board's action was not a reasonable conclusion based on the evidence available to it.

There is nothing wrong with openly opposing the union or conducting an antiunion campaign so long as it does not impinge upon the rights of the employees (*N.L.R.B.* v. *Monroe Tube Co., Inc.* (2d Cir. 1976) 545 F.2d 1320, 1327-1328; *N.L.R.B.* v. *M & W Marine Ways, Inc.* (5th Cir. 1969) 411 F.2d 1070, 1073). Viewing the evidence most favorable to support the Board's finding, I can only see an inquiry of a friend to determine if counseling is appropriate and a statement of cautionary advice, not a command. This was given to a friend apart from an antiunion setting. This setting and the absence of intimidating effect were confirmed by other witnesses. If such a dispassionate, nonintimidating conversation between friends is illegal, there is no right of free speech ever to be conceded in union matters.

I would reverse the Board's order as it applies to Avitua, for it is contrary to the law requiring us to consider the "total effect on the

receiver" of the statement (*N.L.R.B.* v. *Four Winds Industries, Inc., supra*, 530 F.2d 75, 78).

### B.   Shovel Crew Foreman Ramon Gonzales

The very spotty and ambiguous nature of the evidence, its credibility cloaked with the doubts of the ALO evidenced by his rejection of this claim, demands special attention. The alleged unfair labor practice applicable to Rodriguez occurred when Gonzales asked him if he had a UFW button. While the employee has a protected right to wear a union badge, and interfering with that right is an unfair labor practice, asking "whether" the employee had to wear the badge is not an unfair labor practice (*Lee Cylinder Div. of Golay & Co.*, 156 N.L.R.B. 1252 (1966), nor is the inquiry "why he is wearing the badge" (*Dixisteel Bldg., Inc.*, 186 N.L.R.B. 393 (1970)). Nowhere is there evidence the questions of Gonzales to Bermea about Berumen, were coercive or intimidating so as to inhibit organizational activities. There was no effort to obtain the organizing list nor serious threat to sue anyone. The statement cannot be construed as anything more than idle conversation. We are directed to no specific evidence upon which the Board relied for its conclusions there was in fact coercion or questions made in a threatening manner, for there is none.

I would reverse the Board's order as it applies to the charges concerning Rodriguez and his supposed conversations relating to Bermea and Berumen.

### C.   Irrigator Foreman Charlie Figueroa/Employee Abelino Ortega

The language was not coercive or threatening. The Board preferred to rely on Ortega's testimony that he understood "you let the one you are holding go to get the ones that are flying, and at the end you are going to end up with nothing," to mean he was going to "end up without a job at Abatti." That is an unwarranted conclusion, especially in light of the requirement that findings contrary to the ALO findings must be carefully scrutinized. Statements of opinion and reasons why one should not join the union are properly protected by the United States constitutional right of free speech.

I would reverse the Board's order as it applies to Ortega.

### D. Other Interrogations

In each instance, the conversations were friendly; as the majority points out, statements were made by way of "prediction." The Board agreed the employees were not intimidated by the statements but somehow envisioned enough facts to support their finding of threats of loss of jobs. An honest discussion of the issues and consequences, without intimidation, is what the law expects. I believe everything said here should be protected under the free speech doctrine.

### Discriminatory Discharges/Refusals to Rehire.

Acknowledging the law to be as stated in the majority opinion, I would review the facts on each of the cases. The evidence is extremely meager concerning these January layoffs and failure to rehire and, in light of the ALO's dismissal of these claims, I have reservations about the Board's action but reluctantly accept in each instance even the most tenuous thread of evidence to support its ruling. On that basis alone, I can conclude there is substantial evidence to support all but the three cases discussed below.

### A. Shovel Crew

The majority acknowledges the discharge was apparently based on Gonzales' memory of the employee's seniority, which it considered to be wrong, though without apparent antiunion reference, since the layoff of this crew included both union and nonunion employees. It is the refusal to rehire which must be addressed in any event.

### B. Berumen

There was no evidence the company knew of Berumen's union activity. Gonzales denied knowledge and Berumen said he did not know if the company was aware of it. The fact Berumen engaged in such activity is not enough to raise an inference Gonzales knew of it, especially where it was done secretly so Gonzales would not know. Knowledge of union activity is essential to show it motivated the discharge (*N.L.R.B. v. Garner Tool and Die Manufacturing, Inc.* (8th Cir. 1974) 493 F.2d 263).

There is no evidence here to support a charge of unfair labor practice.

### C. Chavarria

There was evidence he was often absent and, when on the job, often drunk. The essential element missing here to establish entitlement to be rehired was that Chavarria never applied for work. Another worker with poor attendance was hired when he applied. While the Board decision states the rule properly, i.e., the employee is not required to do a futile act, and cites *Teamsters* v. *United States* (1977) 431 U.S. 324 at page 366 [52 L.Ed.2d at p. 434, 97 S.Ct. 1843, 1870], the rule does not exempt everyone from the requirement of applying for employment. The Supreme Court in that same case said at 431 U.S. pages 366 and 367 to 368 [52 L.Ed.2d pp. 434, 435, 97 S.Ct. at pp. 1870, 1871]: "... When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

".      .      .      .      .      .      .      .      .      .      .      .      .      .

"To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonapplicants are always entitled to such relief. A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices...." That case involved a situation where the employer *announced* his policy of discrimination by posting a sign reading "Whites Only." The court pointed out that the same message could be communicated more subtly but just as clearly by his practices—consistent discriminatory treatment of actual applicants, by the manner he advertises vacancies, responses to inquiries, etc. None of that is in evidence here. There is antiunion animus here to be sure, but no evidence of any discriminatory hiring practices within Chavarria's knowledge which would lead him to believe application for work was futile. The employer's discriminating practices were not apparent at that time.

### D. Sprinkler Crew

The layoff here was due to work slowdown, not discrimination. The question remains, was the refusal to rehire discriminatory. I would af-

firm the action of the Board except as it applies to Miguel Lopez Chavez, who testified he never applied for work.

As to other employees, while the evidence is conflicting and tenuous, it is sufficient to support the Board's conclusion Abatti's refusal to re-hire was a violation of law.

A petition for a rehearing was denied July 10, 1980. Cologne, J., was of the opinion that the petition should be granted. Petitioner's application for a hearing by the Supreme Court was denied August 28, 1980. Bird, C. J., did not participate therein.