NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AYER LAR SANITARIUM, Respondent.

No. 25462.

United States Court of Appeals,
Ninth Circuit.

Dec. 10, 1970.

Marjorie Gofreed (argued), Atty., Marcel Mallet-Prevost, Asst. Gen., Counsel, Washington, D. C., Ralph E. Kennedy, Director of NLRB, Los Angeles, Cal., for appellant.

Harry R. Stang, Beverly Hills, Cal. (argued), of Levy, Deroy, Geffner & Van Bourg, Los Angeles, Cal., Tyre & Kamins, Beverly Hills, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and LEVIN,* District Judge.

LEVIN, D. J.

## I. INTRODUCTION

Following a charge filed by Hospital and Professional Employees' Division, Local 399, Building Service Employees' International Union ["Union"] on February 15, 1968, a complaint and an amended complaint issued from the National Labor Relations Board's ["Board"] regional director on March 29 and May 31, 1968, respectively. A hearing was held before a Board trial examiner on July 16 and 17, 1968, and the examiner found that respondent Ayer Lar Sanitarium ["Company"] had committed unfair labor practices in violation of § 8(a) (1), (3), and (5) of the Labor-Management Relations Act ["Act"], 29 U.S.C. § 158.[1] Based on such finding, the trial examiner recommended, inter alia, that a bargaining order issue in the Union's favor.

On April 30, 1969, the Board adopted the trial examiner's recommendations. 175 NLRB No. 119. Thereafter, the Board reconsidered its decision sua sponte in light of the intervening Supreme Court decision in N. L. R. B. v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and

---

* The Honorable Gerald S. Levin, United States District Judge for the Northern District of California, sitting by designation.

1. 29 U.S.C. § 158 provides in pertinent part:
   (a) It shall be, an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [to organize, collectively bargain, etc.] of this title;
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * * ;
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title.

on November 13, 1969, the Board affirmed its initial decision. 179 NLRB No. 194. The matter is now before this court on the application of the Board for enforcement of its order.

The issues under consideration here are:

(1) Whether substantial evidence on the record considered as a whole supports the Board's finding that the Company interfered with, restrained, and coerced its employees in violation of § 8(a) (1) of the Act;

(2) Whether substantial evidence on the record considered as a whole supports the Board's finding that the Company discharged employee Osby because of her union activities, in violation of § 8(a) (1) and (3) of the Act;

(3) Whether the Board properly found that the Company refused to recognize the Union as the majority representative of respondents' employees, in violation of § 8(a) (1) and (5) of the Act, and that a bargaining order is necessary to effectuate the policies of the Act.

The facts of this case may be summarized as follows: the Union began an organizational campaign among the Company's employees in September of 1967, and by November 20, 1967, 17 of the Company's 24 employees had signed union authorization cards. On November 20, 1967, the Union wrote the Company stating that it represented a majority of the employees in an appropriate unit, demanded recognition and bargaining, and offered to submit to a card check.

On November 27, 1967, Mr. and Mrs. Ayers, owners and operators of the Company, held a meeting of the employees and informed them that the Union would not be recognized for bargaining purposes. The same day, the Ayres wrote the Union that they had no basis for concluding that the Union represented an uncoerced majority of the employees in an appropriate unit.

On November 28, the Union filed a representation petition with the Board requesting certification in a unit consisting of "All nonprofessional employees of the Employer, including dietary employees, maids, janitors, store keepers, orderlies, nurses' aides, licensed vocational nurses and laboratory helpers * * *."

A few days later, employees Saavedra and Doil told Supervisor of Nurses Miller that they wished her to write letters for them withdrawing their Union authorizations. Thereafter, the Board found, Miller told other employees that similar letters [requesting withdrawal] were in her office and tacitly encouraged other employees to utilize such letters.

At about the same time, and shortly before the pending Union election, Mrs. Ayers questioned employee Rouse about her having sent in an authorization card. When she replied that she had done so, Mrs. Ayres stated, "Mr. Ayers and I talked it over and we wouldn't be able to pay the union price if it come in, and we would have to cut corners somewhere." Mr. Ayres told employee Henderson that if the Union came in he would have to cut corners and would have to engage a catering service to serve the patients. Mr. Ayers told employee King that, "I don't want the union in here and if it does get in here, I will close the place down." In response to employee Saavedra's comments about the Union's desire for increased wages and other benefits, Mr. Ayers said, "Well, we could work something out, you know, after it is all settled * * * [we] would probably just give them a five-cent an hour wage increase instead of a holiday." Employee Saavedra informed the other employees of this conversation.

On the day before the Union election, Mr. Ayres and Nurse Miller told employees Saavedra and Doil to attend a pancake breakfast that the Union was holding. This they did. The Board found that Mr. Ayers had told them to find out what was going on at the breakfast and who was there and then to come back and tell him.

The election was held on January 23, 1969, and the Union lost by a vote of 11–9, with one vote challenged (that of

Mr. Ayers' son). The Union then filed objections to the election which were consolidated for hearing with the present unfair labor practices charges.

About two weeks after the election, Nurse Miller discharged employee Osby, the Union's only observer at the election. Osby had worked competently for the Company for the previous two years. The Company claims that Osby's discharge resulted from a complaint from a patient's son to the effect that she had been handling the patient somewhat roughly. No investigations were made, however, of the complaint and Osby was not given an opportunity to rebut the complaint. Moreover, upon her discharge, Osby was told by Nurse Miller that the firing was none of her doing and that she would like to keep Osby there and that she would give Osby a letter of recommendation upon request.

On the basis of the foregoing, the Board found that the Company had violated § 8(a) (1) of the Act by engaging in surveillance of union activities; coercive investigation; solicitation and assistance of withdrawals from the Union; promises of benefits; and threats of discharge, subcontracting and plant closure. The Board also found violations of § 8(a) (1) and (3) of the Act by the Company's discharging Osby because of her union activity. Finally, the Board found a violation of § 8(a) (1) and (5) of the Act in that the Company refused to recognize and bargain with the Union and thereafter embarked upon a campaign of unfair labor practices calculated to make the holding of an election "a less reliable indication of the employees' free choice than the cards by which they designated the Union to represent them."

## II. DISCUSSION OF APPLICABLE LAW

A. *Restraint and Coercion of Employees*

■ The allegations of the conduct of Nurse Miller and of the Ayers are sufficient to support the finding of the commission of an unfair labor practice within the meaning of § 8(a) (1) of the Act.

The main thrust of the Company in this proceeding is that the trial examiner erred in crediting virtually all of the pro-union testimony of the witnesses while crediting none of that which tended to support the arguments of the Company. Indeed, the trial examiner prefaced his findings with the following statement as to the Company's witnesses, Mr. and Mrs. Ayers and Nurse Miller: "Their respective demeanors impressed me unfavorably, and I do not credit their testimony unless corroborated by otherwise credited testimony."

Relying largely on the testimony discredited by the trial examiner, the Company argues that the employees who signed withdrawal letters came to Nurse Miller to do so and were not coerced; that there was no surveillance since the employees asked permission to go to the Union breakfast and were not asked nor did they in fact report anything back; that the Ayers had long considered a catering service, which suggestion employee Henderson translated into anti-union threats; and that the recollections of employee King must be discredited since she was no longer employed by the Company at the time she alleges that certain statements were made to her.

■ The short answer to the Company's contentions here is that the Board found to the contrary and its findings are supported by the record. The findings of the Board must be upheld if supported by substantial evidence viewing the record as a whole. Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court cannot displace the Board's choice between two fairly conflicting views, even though this court would justifiably have made a different choice had the matter been before it de nova. National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) (citing Universal Camera, 340 U.S. at 488, 71 S.Ct. 456); N. L. R. B. v. Custom Chair Manufacturing Co., 422 F.2d 1300, 1301 (9th Cir. 1970). This

deference extends as well to the inferences reasonably drawn by the Board, even though this court might have drawn different ones. N. L. R. B. v. United States Railway Equipment Co., 424 F.2d 86, 89 (7th Cir. 1970).

██ On the credibility question, this court may decline to follow an examiner's crediting or discrediting of testimony in "a proper case," N. L. R. B. v. Luisi Truck Lines, 384 F.2d 842, 846 (9th Cir. 1967); N. L. R. B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421, 426 (6th Cir. 1964), but the examiner's findings as to credibility should not be disturbed unless "a clear preponderance of all the relevant evidence convinces that they are incorrect." Luisi Truck Lines, 384 F.2d at 846. The examiner need not accept as true statements made by the respondent's own witnesses, even if uncontradicted, National Labor Relations Bd. v. Howell Chevrolet Co., 204 F.2d 79, 86 (9th Cir. 1953), aff'd, 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215 (1953), and the examiner is entitled to make such a determination solely on the basis of his evaluation of the witnesses' demeanors. National Labor Relations Bd. v. Radcliffe, 211 F.2d 309, 315n.6 (9th Cir. 1954).

██ Relying on the testimony credited by the examiner and adopted by the Board, it is clear that it supports a showing of unfair labor practices under the applicable case law. Thus, e. g., coercive investigation constitutes an unfair labor practice. Santa Fe Drilling v. N. L. R. B., 416 F.2d 725, 728 (9th Cir. 1969); N. L. R. B. v. Quick Shop Markets, Inc., 416 F.2d 601, 604–605 (7th Cir. 1969). For a discussion of guiding factors to determine whether questioning is coercive, see N. L. R. B. v. Varo, Inc., 425 F.2d 293, 298 (5th Cir. 1970).

██ Likewise, it is an unfair labor practice to threaten reprisal for union support or promise benefits for anti-union activity. Santa Fe Drilling, *supra*, 316 F.2d at 729; Luisi Truck Lines, *supra*, 384 F.2d at 845. The threats in question need not be explicit if the language used by the employer or his representative can reasonably be construed as threatening. Colonial Corporation v. N. L. R. B., 427 F.2d 302, 305–306 (6th Cir. 1970). No proof of an anti-union motive need be found if the employer's discriminatory conduct is inherently destructive of important employee rights. N. L. R. B. v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

### B. *The Discharge of Osby*

██ The Company contends that employee Osby was not discharged for her union activity as an observer at the Union's election because she was not fired until after the election, although grounds existed theretofore, in order that this very charge be avoided; because the complaint against her was a sufficient reason for her discharge; and because no anti-union motive could have been present since other employees equally active in the Union were not discharged.

Again even though there exists some conflict as to the reason for Osby's discharge, the explanation accepted by the Board is reasonable and supported by the evidence. It is the province of the Board to decide on conflicting evidence what the employer's motivation was, United States Rubber Company v. N. L. R. B., 384 F.2d 660, 663 (5th Cir. 1967), and the Board need not have relied on the Company's self-serving declaration on this point. Shattuck Denn Mining Corp. (Iron King Ranch) v. N. L. R. B., 362 F.2d 466, 470 (9th Cir. 1966).

██ Certainly in the absence of other circumstances the employer has the right to discharge its employees, N. L. R. B. v. Audio Industries, Inc., 313 F.2d 858, 861 (7th Cir. 1963), and the mere fact that an employee is or was participating in union activities does not insulate him from discharge. H. L. Meyer Company v. N. L. R. B., 426 F.2d 1090, 1094 (8th Cir. 1970); N. L. R. B. v. Hanes Hosiery Division, Hanes Corp., 413 F.2d 457, 458 (4th Cir. 1969).

On the other hand, the cases are legion that the existence of a justifiable ground for discharge will not prevent such discharge from being an unfair labor practice if partially motivated by the employee's protected activity; a business reason cannot be used as a pretext for a discriminatory firing. E. g., N. L. R. B. v. Central Power & Light Company, 425 F.2d 1318, 1322 (5th Cir. 1970); Borek Motor Sales, Inc. v. N. L. R. B., 425 F.2d 677, 680–681 (7th Cir. 1970); N. L. R. B. v. Midtown Service Co., 425 F.2d 665, 670 (2d Cir. 1970); N. L. R. B. v. Princeton Inn Company, 424 F.2d 264, 265 (3d Cir. 1970); McGraw-Edison Company v. N. L. R. B., 419 F.2d 67, 76 (8th Cir. 1969); Hanes Hosiery, supra, 413 F.2d at 458. The test is whether the business reason or the protected union activity is the moving cause behind the discharge. N. L. R. B. v. Security Plating Company, 356 F.2d 725, 728 (9th Cir. 1966). See also Kellwood Company, Ottenheimer Bros. Mfg. Div. v. N. L. R. B., 411 F.2d 493, 498 (8th Cir. 1969). In other words, would this employee have been discharged but for his union activity? Southwest Latex Corporation v. N. L. R. B., 426 F.2d 50, 54–55 (5th Cir. 1970).

The Board answered this last question in the negative and, as noted above, the record supports this interpretation. The relevant factors here include the lack of inquiry into the complaint and the failure to permit the employee to explain, see Sterling Aluminum Company v. N. L. R. B., 391 F.2d 713, 723 (8th Cir. 1968); the timing of the discharge, see Borek Motor Sales, supra, 425 F.2d at 681; and the coincidence of the discharge with other § 8 violations, see N. L. R. B. v. Stemun Manufacturing Company, 423 F.2d 737, 742 (6th Cir. 1970).

### C. Company's Refusal to Bargain and Propriety of Order

The last issue concerns the unfair practice growing out of the Company's refusal to recognize or bargain with the Union and the propriety of the Board's issuing a bargaining order on the basis of a once-existing card majority.

The Company claims it was entitled not to recognize or bargain with the Union after the latter requested such following its majority card authorization since (1) the Union did not clarify the bargaining unit it represented; (2) the Company was justified in questioning the majority status of the Union since many of the authorization cards were signed a good deal earlier or appeared suspect; (3) apparently some employees. may have thought the cards were to indicate an election only.

The Board found to the contrary as to each of these contentions: (1) the Union's demand for recognition was found to be clear; (2) the Company did not have a basis for denying recognition, the authorization cards having accounted for 17 of 24 employees, a clear majority; and (3) the cards were accurate and not merely election cards.

Relevant to point (2) is the Supreme Court decision in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), reh. den. 396 U. S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969). The issue before the Court was the extent of the employer's duty to recognize a union basing its claim to representative status solely on possession of union authorization cards and what employers might do to resist such card-based recognition. The Court noted that although traditionally an employer could refuse to bargain if he had "good faith doubt" about the union's majority status (the defense raised here by the Company), the Court in Gissel noted that under the Board's current practice, the employer's good faith doubt is "largely irrelevant." Id. at 594, 89 S.Ct. 1918. See also Note, "NLRB v. Gissel Packing Co.: Bargaining Orders and Employee Free Choice," 45 N.Y.U.L.Rev. 318, 334 (1970).

Although some commentators have been unclear as to whether the Supreme Court was repudiating the "good faith doubt" rule outright or merely expressing the Board's position without endors-

ing same, most courts have and evidently will accept the Supreme Court's statement as an indication of its own dissatisfaction with the old rule. Accordingly, an employer's "good faith doubt" is not sufficient reason to refuse to bargain with a union claiming a majority, even if only card-based. *See* N. L. R. B. v. S. E. Nichols-Dover, Inc., 414 F.2d 561, 565 (3d Cir. 1969), cert. den., 397 U.S. 916, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970).

The last point here concerns the propriety of the remedy recommended by the Board, namely the bargaining order. The Board has, of course, broad discretion to fashion such remedies as are necessary to effectuate its orders. Accordingly, in some instances the Board has issued bargaining orders in addition to or instead of cease and desist orders (a practice recognized and approved in *Gissel*) lest the employer benefit from its own wrongful acts.

In a context such as that before us the bargaining order may be dangerous since, at least at this point, the Union apparently no longer represents a majority. *See* N. L. R. B. v. Patent Trader, Inc., 415 F.2d 190, 200–202 (2d Cir. 1969). The Court in *Gissel* also recognized the superiority of the election process over the card count and that a bargaining order issued on the basis of a card majority is not a preferred method of establishing a union's representative status. N. L. R. B. v. American Cable Systems, Inc., 427 F.2d 446, 448 (5th Cir. 1970).

Nonetheless, the Court in *Gissel* did recognize that an election is not the only way for recognition and that cards may suffice. *Gissel*, 395 U.S. at 592, 89 S. Ct. 1918. Apparently the Board has taken the Supreme Court at its word and now commonly issues bargaining orders in unfair labor cases. *See* Perl, "The NLRB and Bargaining Orders: Does a New Era Begin with *Gissel*?" 15 Vill.L. Rev. 106, 113 (1969). When does a card majority warrant a bargaining order? When the employer's conduct is disruptive of the election process, "cards may be the most effective—perhaps the only

—way of assuring employee choice." *Gissel* at 602, 89 S.Ct. at 1934. In such a case a bargaining order may issue even though the union has not maintained its majority status. Id. at 610, 89 S.Ct. 1918. As the Court concluded:

The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should emphasize, where there is also a showing that at one point the union had a majority; * * * *Id.* at 614, 89 S.Ct. at 1940.

Several cases both before and after *Gissel* have approved the use of the bargaining order where the employer's unfair labor practices have resulted in the dissipation of a union majority. *E. g.*, Snyder Tank Corporation v. N. L. R. B., 428 F.2d 1348, 1350–1 (2d Cir. 1970); N. L. R. B. v. Li'l General Stores, Inc., 422 F.2d 571, 574 (5th Cir. 1970); Amalgamated Clothing Workers of America v. N. L. R. B., 136 U.S.App.D. C. 226, 419 F.2d 1207, 1209 (1969), cert. den., 397 U.S. 988, 90 S.Ct. 1120, 25 L. Ed.2d 396 (1970); N. L. R. B. v. L. B. Foster Company, 418 F.2d 1, 3–4 (9th Cir. 1969), cert. den., 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970); N. L. R. B. v. Wylie Manufacturing Company, 417 F.2d 192, 195–196 (10th Cir. 1969), cert. den., 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970); Wausau Steel Corporation v. N. L. R. B., 377 F. 2d 369, 373–374 (7th Cir. 1967). Some factors respecting the issuance of such an order are listed in Note, *supra*, 45 N.Y.U.L.Rev. 318, 339–341.

The Company is left only with the argument that the conduct here complained of is within an exception noted by the *Gissel* Court:

We emphasize that under the Board's remedial power there is still a

third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order. Id. at 615, 89 S.Ct. at 1940.

Suffice it to say that the discussion above establishes that the Company committed unfair labor practices which were not minimal and which did in fact impede the election process here. The order of the Board is enforced.