**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRI-STATE STORES, INC., Respondent.**

No. 71-1563.

United States Court of Appeals,
Ninth Circuit.

Sept. 29, 1972.

Rehearing Denied June 18, 1973.

Joseph C. Thackery, Atty. (argued), Paul J. Spielberg, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Eugene G. Goslee, Acting Gen. Counsel, NLRB, Washington, D. C., Charles M. Henderson, Director, Region 19, NLRB, Seattle, Wash., for petitioner.

George J. Tichy (argued), Spokane, Wash., Lloyd G. Martinson, Moscow, Idaho, Thomas K. Cassidy, of Basset, Donaldson & Hafer, Seattle, Wash., for respondent.

Before HAMLEY, GOODWIN and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

Pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), the National Labor Relations Board (hereinafter "NLRB") has petitioned this Court for enforcement of its order issued against Tri-State Stores, Inc. (hereinafter "Company") on October 1,

1970.[1] The NLRB has ordered the Company to cease and desist from committing unfair labor practices, to offer to reinstate a discharged employee and to bargain with the Union upon demand.[2] We hold the order of the NLRB is to be enforced.

The Company's department store in Moses Lake, Washington, was the situs of the alleged unfair labor practices. It is one of two stores owned and operated as separate corporations by Doris E. Connelly. The other is located in Moscow, Idaho, about 100 miles away, where Connelly has her office and where the administrative functions of both stores are centered. The Moses Lake store had 41 employees at the time of the alleged violations.

Prompted by Connelly's requiring polygraph tests to stem suspected pilferage, some of the Moses Lake employees held a meeting on September 2, 1969, to discuss this and other grievances. A Teamsters Union representative met with them and later contacted a Retail Clerks Union representative who met with 23 employees the following night. At that meeting, 22 signed cards authorizing the Union to act for them, and 6 more signed cards within a week, for a total of 28.

When the meetings were reported to Connelly, she sent Terri Clevenger (a management consultant), together with a gentleman business friend, to Moses Lake to deal with the situation. During a meeting with employees on September 6, Clevenger remarked that there were "questions coming up about raises," said she "wanted [the employees] to be happy," and asked if they "had anything bothering [them] or that [they] would like to have done." An employee asked if a five-day work week could be substituted for the six-day week and Clevenger replied that she "didn't know why [not]." Clevenger and the business friend then returned to Moscow and gave assurances to Connelly that, if Clevenger spent further time in Moses Lake, the employees would be "calmed." About this time, the Company posted a notice at Moses Lake that the polygraph tests had been postponed.

There was also testimony that, on September 9 at a meeting of department managers, Clevenger advised that the doors would be closed if the employees unionized. Pursuant to a discussion in that meeting, all department heads immediately solicited the employees to send letters revoking the prior authorization given by the cards. Some employees were told of the threat to close the store. By the end of the day, 35 employees[3] wrote letters stating they no longer wished the Union to represent them.

During the second week in September, employees who worked six days a week were rescheduled to five although they continued to work 40 hours. About three weeks later, however, the Company restored the original schedule. In addition, 19 employees received wage increases in their pay checks distributed some time after the middle of September. All but one of those receiving increases had either written a withdrawal letter or had never signed an authorization.

The NLRB affirmed the Trial Examiner's findings (1) that the Company violated § 8(a)(1) of the Act by questioning its employees concerning their union activities, threatening them with closing the store if they did not cease such activity, soliciting them to withdraw their Union authorization cards and increasing their wages and improving their working hours to induce them to defect from the Union; (2) that the Company violated §§ 8(a)(3) and 8(a)(1) of the Act by discharging employee Ilse Iliff because of her interest in and activities on behalf of the Union; and (3) that the Company violated §§ 8(a)(5) and 8(a)(1) of the Act

1. The NLRB's decision and order are reported at 185 NLRB No. 117 (1970).

2. The Union involved is Retail Clerks Union, Local 1439, AFL–CIO.

3. Apparently, out of an abundance of caution, more withdrawal letters were solicited than the number of union cards signed.

by refusing to bargain with the Union upon request after the Union had obtained authorization cards signed by a majority of the employees in an appropriate unit.

We have reviewed the record as a whole and conclude that there is substantial evidence therein to support the findings of the NLRB. 29 U.S.C. § 160 (e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Company has especially challenged the finding in relation to the discharge of Ilse Iliff. The Company argues that Moses Lake store manager Ehart had an adequate and independent legal basis for the discharge of Iliff. There is clear evidence in the record of Iliff's insubordination. In front of other employees, Iliff called Ehart a "puppet on a string" and made several outspoken, rather critical, suggestions to Ehart as to how the store should be managed, including a suggestion of pay raises. Iliff also spoke critically of Ehart to her fellow employees and related the "puppet on a string" incident to them.

██ On the other hand, the apparent reason that Iliff called Ehart a "puppet on a string" was that she felt that Ehart did not have enough authority to do anything about employees' grievances and, therefore, a trip to Moscow by Iliff to speak with Connelly would be necessary. Furthermore, four days prior to Iliff's discharge the office manager for both stores telephoned Iliff, interrogated her about the Union's organizational attempts and asked whether she had signed a Union authorization card. Although the office manager denied any knowledge of such a call, it is well-settled that the Trial Examiner has the responsibility of evaluating the credibility of witnesses and the weight to be given their testimony since he is in a position to observe demeanor and other firsthand indications of truthfulness. See NLRB v. Ayer Lar Sanitarium, 436 F.2d 45, 49 (9th Cir. 1970), and cases cited therein. Finally, the Trial Exam-

iner and the NLRB felt the timing of Iliff's discharge significant: she was not fired until two weeks after the "puppet on a string" incident; but the firing occurred on the very day before a meeting of the department managers which she would have attended and at which the subject of Union organizational activity would have been discussed. As we have said before,

[t]his court cannot displace the Board's choice between two fairly conflicting views, even though this court would justifiably have made a different choice had the matter been before it de novo. . . . This deference extends as well to the inferences reasonably drawn by the Board, even though this court might have drawn different ones. NLRB v. Ayer Lar Sanitarium, *supra* at 48–49.

The Company questions the propriety of the NLRB order which directs it to bargain with the Union. The Company conceded the appropriateness of the bargaining unit. The Union obtained 25 valid authorization cards and there were between 38 and 41 nonsupervisory employees. However, the Company refused to bargain with the Union and filed a petition with the NLRB alleging a bona fide doubt as to whether the Union had a majority. The apparent basis of this refusal was the sending of withdrawal letters by employees subsequent to their authorizations. However, there was substantial evidence of threats, coercion and restraint; and one apparent union sympathizer had been discharged. In addition, Connelly told store manager Ehart that she did not want the store unionized and that he should refuse any demand for recognition. Connelly sent Clevenger to Moses Lake to counsel the employees against unionizing; and it is not denied that Clevenger told employees that Connelly would close the store if they did so. Thereafter, various department managers, acting pursuant to the instructions of Clevenger, importuned the employees to withdraw their authorizations and, in some instances, even drafted the withdrawal letters.

In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court in sustaining the NLRB's authority to issue bargaining orders when certain unfair labor practices have been committed, stated:

> The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. 395 U.S. at 614–615, 89 S.Ct. at 1940.

See also NLRB v. Ayer Lar Sanitarium, supra, 436 F.2d at 51; NLRB v. L. B. Foster Company, 418 F.2d 1, 3–4 (9th Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970).

█ The NLRB found that a bargaining order was needed here because the unfair labor practices were "intended to undermine the Union and were so coercive as to destroy the likelihood of holding a free election among its employees." Since this finding is supported by substantial evidence, the order to bargain is appropriate under Gissel. The Company interrogated and discharged a suspected Union sympathizer. It raised wages, changed working hours, threatened to close the store, and caused 35 of the 38 to 41 eligible employees to disavow the Union. There is substantial evidence to support the NLRB's conclusion that: "In such circumstances, it strains credulity for respondent to assert its good faith, particularly when such assertion is predicated upon card revocations which were obtained through its own unlawful conduct."

The Company argues that, even if it has been guilty of the unfair labor practices mentioned, the passage of time has dissipated the effects so thoroughly as to make an order to bargain inappropriate. As we stated in NLRB v. South Bay Daily Breeze, 415 F.2d 360, 367 (9th Cir. 1969), cert. denied, 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970):

> We recognize that the passage of time brought about by respondent's conduct may have cooled the organizational ardor that existed in 1965 or, indeed, may have seen the occurrence of substantial changes in the composition of the bargaining unit; but these difficulties are in some measure, the sort that inhere in any orderly system of adjudication, and are in any event not determinative. (Citation omitted.)

We have already pointed out the difficulty with the position argued for by the Company: employers would gain a great incentive to refuse to recognize a bona fide bargaining demand in hopes that a delay would terminate the difficulty. See NLRB v. L. B. Foster Company, supra, 418 F.2d at 4.

Accordingly, we find that the NLRB's bargaining order is a reasonable exercise of its discretion and must be enforced in its entirety.