**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Leavitt J. COFER, Eunice Cofer, and Travelodge International, Inc., a partnership, d/b/a Marysville Travelodge, Respondent.**

**No. 78–1596.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 16, 1980.

Decided Jan. 26, 1981.

---

Jesse J. Etelson, N.L.R.B., Washington, D. C., argued for petitioner; Elliott Moore, N.L.R.B., Washington, D. C., on brief.

Robert P. Beckham, Argue, Freston & Myers, Los Angeles, Cal., for respondent.

Before WRIGHT, WALLACE and FERGUSON, Circuit Judges.

WALLACE, Circuit Judge:

The National Labor Relations Board (the Board) seeks enforcement of its order directing Leavitt J. Cofer, Eunice Cofer and Travelodge International, Inc. (Travelodge), a partnership, to reinstate four dismissed employees, with back pay, and to bargain with Hotel Restaurant Employees & Bartenders Union, Local No. 49 (the Union). The issues are: (1) whether the Board properly exercised its discretionary jurisdiction, (2) whether there is substantial evidence in the record considered as a whole that the employees were dismissed for engaging in protected activity, and (3) whether the bargaining order was appropriate. We answer all three questions in the affirmative, and enforce the order.

I

In September 1974, the Cofers and Travelodge executed a standard form joint venture agreement, the purpose of which was "the joint operation of a motel known as the Marysville Travelodge," located in Marysville, California. The Cofers and Travelodge each have a 50% interest in the motel.

The Cofers employed William and Dorothy Loy as managers of the motel. On

February 25, 1976, the motel employed six maids, one maintenance man, and a temporary painter. That morning Mr. Loy assigned maid Nora K. Chavez to train new maid Valerie Ketcham. Training of new maids was a task normally performed by head maid Norma Keffer. Shortly before noon, Keffer asked Mrs. Loy why Chavez had been assigned to train Ketcham. Mrs. Loy replied that she did not know because Mr. Loy had made out the work assignment sheet that morning. Keffer asked Mrs. Loy why the motel was not paying the other maids $2.20 per hour, as that amount was posted on a minimum wage notice on the motel bulletin board. Mrs. Loy responded that she felt that the maids were receiving the correct rate of pay. Keffer then asked Mrs. Loy for the telephone number of the Travelodge "headquarters." According to Keffer's testimony she also told Mrs. Loy that "we were going to go to the Labor Board because we were tired of what was going on." Mrs. Loy told Keffer that she could pick up the Travelodge telephone number later. Keffer then returned to work.

Keffer, Chavez, and maid Sharon Watts decided at noon to go to the "Labor Board." However, they were unable to find a listing for "Labor Board" in the telephone book. They did find a listing for the Union and decided to go to the Union office after work. At the end of the day, Keffer, Chavez, and Watts left together in one car. Mrs. Loy testified that she thought that the three maids were going to the "employment office" to check on the minimum wage. At the Union office all three maids signed applications for membership which designated and authorized the Union to represent them for collective bargaining purposes. That evening, maid Ellen Reynolds, who had not worked that day, signed an identical application for membership.

The administrative law judge (ALJ) found that Mr. Loy called Keffer the next day to tell her to stay home for a few days to cool off. Also on the morning of February 26, Chavez and Watts called in, as was customary, to find out if they were scheduled to work that day. They were told that there was no work. Keffer, Chavez and Watts continued to call in on a daily basis for several days and each day were told that they were not needed.

On February 29, Keffer confronted Mr. Loy. They discussed the conversation between Keffer and Mrs. Loy of February 25, and, according to Keffer, whom the ALJ credited, Mr. Loy said "we don't need the Labor Board brought into here. I have enough problems of my own." At 9:00 a. m. on March 1, Mr. Loy told Keffer that she was "fired" for "personal reasons . . . for upsetting one of my maids."

Later in the morning of March 1, Keffer, Chavez, Watts, and Reynolds went to the California State Unemployment Development Department and filed claims for unemployment. The forms were mailed to the motel on March 1. Mr. Loy's written response to the unemployment claim was that each employee had been fired because "work unsatisfactory." Reynolds, who had not worked on February 25, worked on February 26, 27, 28 and March 2. On March 3, when she called in to inquire whether there was work that day, Mr. Loy told her "that he had got an unfavorable card from the employment office on me, and for me not to return to work."

On the morning of March 1, Webb talked to Mr. Cofer by telephone. It is undisputed that Webb identified himself as a representative of the Union and indicated that he was calling on the behalf of four maids at the motel. Cofer responded that Loy was in charge of the maid situation and that Cofer would stand by Loy's decisions.

The ALJ found violations of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the Act). 29 U.S.C. §§ 158(a)(1), 158(a)(5). The Board adopted the findings and conclusions of the ALJ. It ordered reinstatement of the maids with back pay. It also ordered the employer to bargain with the Union.

II

It is undisputed that the Board has statutory jurisdiction over the motel under 29 U.S.C. § 160(a). *See NLRB v. Reliance Fuel Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312,

313, 9 L.Ed.2d 279 (1963). The Board may, however, decline to exercise jurisdiction at its discretion, under certain circumstances. 29 U.S.C. § 164(c). Pursuant to this grant of discretion, the Board has established a jurisdictional yardstick for the hotel industry of $500,000 annual gross income. *Floridian Hotel of Tampa*, 124 N.L.R.B. 261 (1959). This amount would not be met by the motel itself or by the motel together with the other ventures of the Cofers. The Cofers and Travelodge stipulate, however, that it is met if Travelodge and the motel are counted as a single employer. The issue is, therefore, whether the Board properly considered the annual gross income of Travelodge and the Cofers together in order to meet the Board's self–imposed jurisdictional restraint.

In similar fact situations, the Board has applied four factors in deciding whether to treat closely related concerns as a single employer: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *21st Annual Report of the NLRB*, 14–15. *See NLRB v. Transcontinental Theaters, Inc.*, 568 F.2d 125, 129 (9th Cir. 1978); *Sakrete of Northern California, Inc. v. NLRB*, 332 F.2d 902, 905 & n.4 (9th Cir. 1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). The Cofers and Travelodge argue that because these factors were not specifically found, the Board has no jurisdiction. The question is not so easily decided. "It is settled law that the extent to which the Board chooses to exercise its statutory jurisdiction is a matter of administrative policy within the Board's discretion, . . . and is not a question for the courts, . . . in the absence of extraordinary circumstances, such as unjust discrimination . . . ." *NLRB v. Carroll–Naslund Disposal, Inc.*, 359 F.2d 779, 780 (9th Cir. 1966) (per curiam) (citations omitted). Therefore, the proper review standard is abuse of discretion. To determine whether there has been an abuse of discretion, however, we must be able to follow the agency's reasoning. To this end we have held that "[a]gencies . . . are required to explain departures from agency policies or rules so that a reviewing court is able to

determine if the agency was acting in a reasoned, deliberate manner." *Bob's Big Boy Family Restaurants v. NLRB*, 625 F.2d 850, 852 (9th Cir. 1980). In the present case, the Board failed to mention its four single employer factors. It is not clear, however, that the Board ever intended these factors to constitute a rule for partnership cases such as the present one. The ALJ and the Board apparently did not believe the rule applied and did not find it useful to refer to the four factors in this case. There was no impediment in doing so as the evidence relied upon by the ALJ and the Board is sufficient to satisfy each of the four factors. We conclude that the question of departure from an accepted rule, as in *Bob's Big Boy*, does not arise.

■ The Board's decision certainly provides a sufficient basis for us to find that the Board acted in a reasoned, deliberate way. The Board relied heavily upon the joint venture agreement between the Cofers and Travelodge. The agreement provides that the "parties hereto jointly own the management rights of said motel . . . ." If the Cofers breach any provision of the agreement, Travelodge "shall have the immediate right to assume sole management of said motel . . . ." Moreover, "[n]o leases or contracts whatsoever shall be entered into by any party on behalf of the joint venture without the prior written consent of [Travelodge]." The joint venture agreement also required the Cofers "to follow the procedures set forth in the Operations Manual published by [Travelodge] . . . . No variation from these standards and procedures is permitted without the prior written consent of [Travelodge]." The Operations Manual contains the following section entitled "UNION NEGOTIATIONS" which is of particular significance for the single employer issue:

Do not enter into any negotiation with any union agent or representative until you have conferred with the Legal Department and the Personnel Manager [of Travelodge]. Obtain only the name, address and phone number of the representative for the union, and do not allow any

union agent to show you too much in the way of documentation, since there are notice requirements which could later work against the corporation in an arbitration proceeding. Advise the union agent or representative that it is necessary for you to contact the Corporate Headquarters and that someone will be contacting him in the near future.

It is hard to imagine any one fact more supportive of a single employer determination for purposes of Board jurisdiction than a contractual requirement that the corporate partner be consulted prior to any union dealings by the local partner. Together with the numerous other indications of the close connection between the Cofers and Travelodge that were spelled out by the Board, this union negotiation provision provides a sufficient justification of the finding of single employer status to enable us to determine that the Board was acting in a reasoned, deliberate manner. Therefore, we find no abuse of discretion in the Board's jurisdictional determination.

### III

The Board found that the decision to fire Keffer, Chavez, and Watts was made because they went together after work to lodge a complaint about pay, presumably to a government agency. The Board found that Reynolds was fired because it became clear to the Loys that Reynolds had joined the concerted action aimed at a pay increase. The review standard for these findings is substantial evidence in the record considered as a whole. 29 U.S.C. § 160(e); see *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–91, 71 S.Ct. 456, 459–66, 95 L.Ed. 456 (1951).

We conclude that this test is met. The evidence includes: (1) the timing of the firings, see *NLRB v. Tri–State Stores, Inc.*, 477 F.2d 204, 206 (9th Cir. 1972), *cert. denied*, 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974); (2) failure to advise the employees of the reason for their discharge, see *A. J. Karjewski Mfg. Co. v. NLRB*, 413 F.2d 673, 676 n.2 (1st Cir. 1969); and (3) evidence tending to contradict the employer's explanation of the firing. The contention of the Cofers and Travelodge that Keffer was

fired at noon on February 25, before any mention of going to the "Labor Board" is not credible in light of the fact that Keffer worked that afternoon. The claim that bad work was the motivation for the firings is not supported by the evidence.

Under section 8(a)(1) of the Act, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). Section 7 provides in part that "[e]mployees shall have the right to self–organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

We conclude that when employees join together to seek higher wages from a government agency administering the minimum wage laws, they are engaged in concerted activity for the purpose of mutual aid within the terms of section 7. See *Gibbs Die Casting Aluminum Corp.*, 174 N.L.R.B. 75 (1969). Keffer's statement that they were going to the "Labor Board" suggests that the firing was punishment for intended communication with the Board. Because of the overriding public interest in ensuring unimpeded access to the Board, this possibility increases the seriousness of the violation. See *NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 424, 88 S.Ct. 1717, 1721, 20 L.Ed.2d 706 (1968).

The concerted activity of Keffer, Chavez, Watts, and Reynolds does not fall within any of the judicially recognized exceptions to section 7. See *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962). We therefore conclude that the section 7 rights of Keffer, Chavez, Watts, and Reynolds were infringed by their terminations, in violation of section 8(a)(1).

### IV

The Cofers and Travelodge argue that no bargaining order should issue because the

Board erred in finding that a bargaining demand was made by Union agent Webb. We disagree.

■ We need not decide whether a bargaining demand or a section 8(a)(5) [1] violation is a condition precedent for a bargaining order in this case, *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969) (*Gissel*), because we conclude that the Board's findings of a bargaining demand and section 8(a)(5) violation are supported by substantial evidence in the record considered as a whole.

Webb's account of his conversation with Cofer on March 1 seems to describe an attempt to bring Cofer to bargain on the strength of the four union cards, a majority, on the issues of reinstatement, wages, hours, and conditions. This interpretation of Webb's account was developed by the attorney for the Cofers and Travelodge. On cross–examination the following exchange occurred:

Q: You indicated that on March 1, you called Mr. Cofer, or somebody who identified himself as Mr. Cofer.

A: Yes, I did.

Q: And in essence requested to bargain on behalf of the employees of Marysville Travelodge.

A: (Witness nods affirmatively.)

Webb and the ALJ both seem to have understood Webb's conversation with Cofer as constituting a request to bargain. The ALJ indicated that he found Webb's account believable.

We must, however, also examine evidence running counter to the Board's conclusion on a factual matter. *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 487–88, 71 S.Ct. at 463–64. Cofer's account of the telephone conversation with Webb includes a statement that there was no bargaining request made. The ALJ found that Cofer's specific account of the conversation, however, was compatible with an inference that

a bargaining request was intended. We conclude that the finding of the ALJ and the Board that a bargaining demand was made on March 1 is supported by substantial evidence in the record considered as a whole.

We also conclude that the record supports the Board's finding that the Cofers and Travelodge violated section 8(a)(5) by refusal to bargain. This finding is supported despite the fact that Webb did not press the Cofers or the Loys to bargain after March 1. The firing of all four Union members, as the ALJ found, made it futile to seek voluntary recognition.

Travelodge and the Cofers argue that no bargaining order could issue in this case because the conduct alleged to undermine the possibility of a fair election occurred prior to the time that the Cofers or Loys knew that the Union was involved. *Gissel* indicates that "the union must be able to show the employer's awareness of the drive in order to prove that his contemporaneous conduct constituted unfair labor practices on which a bargaining order can be based if the drive is ultimately successful." *Gissel, supra*, 395 U.S. at 603, 89 S.Ct. at 1934.

■ The argument of the Cofers and Travelodge is weakened by the ALJ's finding that Reynolds was not terminated until March 3–two days after Cofer was made aware that four maids had signed Union authorization cards. The record supports this finding. We need not, however, rely upon the fact that this part of the unfair labor practice was done with awareness of the Union's organizing activities, because we conclude that the three firings carried out without awareness of the role of the Union would support the issuance of a bargaining order.

The concerted activity in this case was a single process of employee self–organization. The fact that after its initial phase it acquired the sponsorship of an already existing union is incidental. A bargaining

---

1. Under section 8(a)(5) it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." 29 U.S.C. § 158(a)(5). Section 9(a) provides for exclusive representation "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a).

order could have been issued to protect the organizing activity of the maids had they taken all actions themselves. They do not lose protection under the Act because they affiliated their own organization with an existing union. The Loys knew of the concerted activity that constituted the early phase of the organizing "drive" before deciding on any of the dismissals. Therefore, the bargaining order does not conflict with the Supreme Court's language in *Gissel.*

 The Cofers and Travelodge also argue that there is no evidence to suggest that the preferable alternative of a free representation election would not be possible here. Whether a free election would be possible is determined by the circumstances that existed when an election was held or could have been held, not by the circumstances that exist when enforcement is under consideration before this court. Otherwise, "employers would gain a great incentive to refuse to recognize a bona fide bargaining demand in hopes that a delay would terminate the difficulty." *NLRB v. Tri-State Stores,* 477 F.2d 204, 207 (9th Cir. 1972), *cert. denied,* 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974) (*citing NLRB v. L. B. Foster Co.,* 418 F.2d 1, 4 (9th Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970)). Therefore, we must review the Board's bargaining order with respect to a unit over half of whose employees had recently suffered illegal dismissals, and whose reinstatement was then ordered. We know of no cases in which a bargaining order has not been enforced following an unfair labor practice so severe in terms of its impact on the employees and in terms of the percentage of employees affected. Moreover, we must give great deference to the Board in reviewing a bargaining order:

> The employers argue that the Fourth Circuit correctly observed that, "in the great majority of cases, a cease and desist order with the posting of appropriate notices will eliminate any undue influences upon employees voting in the security of anonymity." *NLRB v. Logan Packing Co.,* 386 F.2d at 570. It is for the Board and not the courts, however, to make that determination, based on its expert esti-

mate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.

*Gissel, supra,* 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32. We cannot accord the Board's judgment this special respect and deny enforcement to the bargaining order on the facts of this case.

ENFORCED.