642 F.2d 350
 107 L.R.R.M. (BNA) 2248, 91 Lab.Cas. P 12,715
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Steven DAVIS and Michael Provenzano, d/b/a Carlton's Market,
Respondent,
Retail Clerks Union Local 1428, United Food Commercial
Workers International Union, AFL-CIO, Intervenor.
 No. 79-7566.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 9, 1980.
Decided April 20, 1981.
 
 Andrew F. Tranovich, Washington, D. C., for petitioner.
 Robert M. Simpson, Rose, Klein & Marias, Los Angeles, Cal., for respondent.
 
 
 1
 On Application for Enforcement of an Order of The National Labor Relations Board.
 
 
 2
 Before FLETCHER and FERGUSON, Circuit Judges, and FITZGERALD*, District Judge.
 
 FITZGERALD, District Judge:
 
 3
 The National Labor Relations Board ruled that Carlton's Market of El Monte, California engaged in unfair labor practices which dissipated a union majority within the bargaining unit and brought about conditions making a fair representation election impossible. As a consequence, the Board issued a bargaining order and now comes to this court for enforcement.[1]
 
 
 4
 On November 28, 1977, Michael Provenzano and Steven Davis, both experienced in grocery management but inexperienced in labor relations, entered into an agreement with Tajico Corporation to acquire Carlton's Market. The business was in poor financial shape. On the same date, the union[2] completed collection of authorization cards from 13 out of 17 employees at the market.
 
 
 5
 The new management was opposed to the union. Provenzano and Davis discharged six of their employees because of their pro-union activities. Provenzano also told employees that he would do anything to keep the union out. He threatened to fire union supporters, offered wage increases to those who took his side, threatened not to hire people with pro-union sympathies, mentioned reductions in hours for pro-union employees, and stated that he could obtain the discharge of pro-union employees who left his store to work elsewhere if they should prove troublesome to him.
 
 
 6
 On March 13, 1978, the union filed a charge of unfair labor practices with the National Labor Relations Board. Provenzano and Davis then consulted a skilled labor attorney who provided them with a "crash course" in employee relations. There have been no new allegations of unfair labor practices at the market since.
 
 
 7
 An administrative law judge held hearings on the union's complaint in December 1978 and January 1979. The judge refused to admit some evidence indicative of a change of attitude on the part of the management. However, Provenzano and Davis were permitted to show that the number of employees at the market had grown from 17 to 37, of whom 27 had been hired subsequent to any unfair labor practices. At the time of the hearing, only nine members remained of the work force employed at the time the unfair labor practices were committed.
 
 
 8
 The judge found that 15 separate unfair labor practices had occurred in addition to the six prohibited discharges which had been stipulated to. The Board adopted the judge's recommendation and issued an order requiring Carlton's Market to cease and desist its unfair labor practices and to recognize and bargain with the union.
 
 
 9
 Despite respondent's contentions to the contrary, we find substantial evidence in the record as a whole to establish that in December 1977 the union represented a majority of the employees in the bargaining unit, and that the management thereafter committed serious unfair labor practices against the employees and the union. We hold, as well, that the Board's inquiry into whether a fair election might be held was adequate and that the Board's reasons are sufficiently explicit to justify the bargaining order.
 
 ANALYSIS
 
 10
 In NLRB v. Gissel Packing Company,[3] the Supreme Court ruled that a bargaining order could issue in these circumstances if (1) "the Union demonstrates that it represented a majority of the unit employees who signed valid union authorization cards," (2) the employer committed unfair labor practices, and (3) those practices are "bad enough to undermine the free election process."[4]
 
 The Union Majority
 
 11
 The Board correctly determined that the proper size of the bargaining unit was 17, rather than 20 as respondent contends. It found (1) that Donald Conroy was essentially an expert on pricing working for Tajico rather than an employee of the market, (2) that Naushad Kurji was a management trainee with special status more closely aligning him with management than with employees, and (3) that Angus Garrison could be properly excluded as a meat employee in line with current industry practice separating meat and grocery employees. These findings are not arbitrary and capricious as they are supported by substantial evidence.[5]
 
 
 12
 Respondent contends that a majority was not achieved within the unit because the purpose of the authorization cards was misrepresented to the signers. In Gissel the Court adopted the Board's Cumberland Shoe doctrine for dealing with authorization cards when such claims arise.
 
 
 13
 (I)f the card itself is unambiguous (i. e., states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used solely for the purpose of obtaining an election.[6]
 
 
 14
 In this case, the card was unambiguous. Therefore, the management must establish that the signer was told that the card would be used solely for an election in order to exclude it from the count. Our examination of the evidence now relied upon by the respondent reveals that, at best, it can be viewed as conflicting. The testimony of William Rodriguez, who collected the cards, provides substantial evidence in the light of the entire record that a sufficient number of signature cards were properly signed to obtain a majority.
 
 The Unfair Labor Practices
 
 15
 Four employees were discharged by Carlton's Market within a week of signing their union authorization cards. Later two more employees who had signed cards were terminated. Although all six were subsequently offered reinstatement and back pay, we conclude that discharges for protected union activity strike directly at the Act's stated purpose of "encouraging the practice and procedure of collective bargaining ... by protecting the exercise by workers of full freedom of association...."[7] Such violations are among the most serious infringements of the Act possible. Besides these six, there are seven additional findings of unfair labor practices by Carlton's Market which are undisputed. They include Provenzano's coercive interrogation of employees about union sympathies, a statement to an employee that he was trying to keep the union out, his threat to get another employee discharged from any future job because of union activities, and his statements to still another employee that he did not want any discussion of union organization in the market, or anyone in the store who was for the union. These findings reveal a pattern of sustained and serious violation of section 8(a)(1) of the Act.[8]
 
 
 16
 Finally, six more findings of unfair labor practices rest on the administrative law judge's determinations of credibility. All involve conversations which Provenzano had with individual employees. The employees testified that Provenzano threatened discharges and cuts in hours if the union organized the store, repeatedly interrogated them about their attitudes toward the union, and promised wage increases if they would not support it.
 
 
 17
 The findings of the Board must be upheld if supported by substantial evidence viewing the record as a whole.[9] "... (T)he examiner's findings as to credibility should not be disturbed unless a 'clear preponderance of all the relevant evidence convinces that they are incorrect.' "[10] Here the administrative law judge made credibility resolutions on the basis of the demeanor and appearance of the witnesses and explicitly presented her analysis and reasoning for crediting some and not crediting others in her findings. Significant testimony in the record supports her findings which we will not disturb.
 
 The Bargaining Order
 
 18
 An employer's commission of an unfair labor practice does not automatically result in an order to bargain. In choosing a remedy, Gissel instructs the Board to consider the extensiveness of the unfair labor practices, their past effect on election conditions,[11] the likelihood of their reoccurrence, and the probability that a fair election can be held.[12] The relevant time period for consideration of the possibility of a fair election is when the case is before the Board.[13]
 
 
 19
 To document its consideration of these factors, the Board must make findings which are sufficiently explicit to support issuance of a bargaining order. The Board must "clearly articulate the reasons behind any order, and particularly why other remedies were found inappropriate."[14] These findings may not be perfunctory.[15] However, when the Board has considered these matters and determined that a bargaining order is necessary, Gissel counsels deference to the Board's determination of a remedy.[16]
 
 
 20
 In her decision, the administrative law judge concluded that the misconduct of Carlton's management was so pervasive that it made a fair election infeasible:
 
 
 21
 Finally, I reject Respondent's argument that any effect of the unfair labor practices has been dissipated and a fair election is now possible. The extent of Respondent's unfair labor practices are so pervasive that traditional remedies will not erase the effects thereof. Provenzano and Davis deliberately embarked upon a course of action designed to, and which did, undermine the Union's majority. The leading union adherent was discharged along with 5, probably 6, of the 13 card signers in a unit of only 17. Nine of the current employees were employed at the time of the unfair labor practices. The nature of Respondent's conduct discharges, threats of discharges, threat to cause discharge from future employment is the type of conduct which employees are apt to relate to other employees and which is rather difficult, probably impossible to forget or discount. Nor are employees likely to miss the point that backpay and offers of reinstatement made some 9 to 11 months after the discharge does not necessarily compensate for the financial hardship and emotional and mental anguish apt to be experienced during an interim period of unemployment. Thus, such conduct would have a longlasting, if not permanent, effect on the employees' freedom of choice in selecting or rejecting a bargaining representative and it is unlikely, if not impossible, that the Board's traditional remedies would dispel the coercive atmosphere which Respondent has created.
 
 
 22
 Respondent objects to the inferences which the administrative law judge drew from the evidence she relied upon. However, it is well settled that the judge and the Board are entitled to draw such reasonable inferences.[17] Moreover, Gissel teaches that, "... a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship."[18]
 
 
 23
 Respondent suggests that the ruling is perfunctory and mechanically applies Gissel, without regard to context, in a manner forbidden by NLRB v. Western Drug.[19] In that case an administrative law judge determined that the union had failed to achieve a majority within the unit. He made no findings on the question of whether a fair election could be held.[20] The Board reversed the findings of the judge and issued a bargaining order. In reversing the Board, the court in Western Drug said:
 
 
 24
 We limit our holding to the facts presented. The circumstances changed completely before the unfair practice charges were tried, and there was no unusual delay in trying the charges. All the employees in the unit voluntarily terminated their employment for reasons unrelated to the unfair practices. And the Board's findings do not suggest any alternative ground for concluding that an election would not reflect the present employees' true wishes.[21]
 
 
 25
 Western Drug is distinguishable from the case now before this court. Here the administrative law judge clearly stated the reasons upon which she rested her conclusion that remedies short of a bargaining order would be ineffectual. The Board adopted her detailed statement of reasons and in conformity with her findings issued the bargaining order. Western Drug is simply not on point.
 
 
 26
 Respondent argues that the proper time to consider whether a fair election can be held is when the issue is before the Board,[22] in contending that the administrative law judge improperly rejected evidence of change in management attitude toward the union after March 13, 1978.
 
 
 27
 The judge correctly refused to allow an employee to be questioned as to whether a fair election would be possible in the near future. Gissel points out:
 
 
 28
 We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a)(1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry.[23]
 
 
 29
 Other evidence excluded by the judge included Provenzano's offer to testify as to his present attitude toward unions and to his intentional hiring of employees with prounion sympathies after March, 1978. While this evidence is probative of a change of heart on management's part, the error, if any, was harmless since the record contains evidence of events occurring after March, 1978. Detailed records of employee turnover were received, as was evidence of the settlement resulting in reinstatement and back pay for improperly discharged employees.
 
 
 30
 Respondent suggests that reinstatement, plus the published notices, must have "inevitably dissipated any fear that past misconduct will recur." The judge, however, drew a different inference:
 
 
 31
 Nor are employees likely to miss the point that back pay and offers of reinstatement made some 9 to 11 months after the discharge do not necessarily compensate for the financial hardship and emotional and mental anguish apt to be experienced during an interim period of unemployment.
 
 
 32
 The change in the behavior of the Carlton management after it consulted labor counsel was apparent to the administrative law judge; the excluded evidence would have added little. The judge determined that such altered behavior when one faces charges before the National Labor Relations Board is not surprising and probably not a reliable guide to the future. She was justified in concluding that the impact of the management's past unfair labor practices had not been dissipated, and their extent was so pervasive that traditional remedies were inadequate.
 
 
 33
 We find, therefore, that there is substantial evidence in the record to support the factual findings, errors on evidentiary matters, if any, are harmless, and the holdings are sufficiently explicit to support the issuing of a bargaining order. The Board's order is hereby ENFORCED.
 
 
 
 *
 Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 This court has jurisdiction under 29 U.S.C. § 160(e) (1975) a section of the National Labor Relations Act, 29 U.S.C. §§ 151-69 (1975). Hereinafter "the Act."
 
 
 [2]
 Retail Clerks Union, Local 1428, United Food and Commercial Workers International Union, AFL-CIO
 
 
 [3]
 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969)
 
 
 [4]
 The Gissel test as paraphrased and explained in NLRB v. Anchorage Times Publishing Co., 637 F.2d 1359 (9th Cir. 1981). As pointed out in Anchorage Times, Gissel recognized two situations in which a bargaining order may issue. The first occurs where an employer has committed unfair labor practices during an election campaign which are so "outrageous" and "pervasive" that they destroy any possibility of a fair re-run election. In such circumstances, a bargaining order is almost always warranted. The second situation, at issue here, involves less flagrant violations which nonetheless undermine the possibility of a fair election. It requires a showing that the union once achieved majority status within the unit. Gissel also identified a third situation in which a bargaining order is not justified because the employer's practices have had minimal effect on the election process
 
 
 [5]
 NLRB v. Convair Pomona, 286 F.2d 691, 696 (9th Cir. 1961)
 
 
 [6]
 395 U.S. at 584, 89 S.Ct. at 1925 (emphasis in original); compare id. at 606-08 and n. 27, 89 S.Ct. at 1937 and n. 27
 
 
 [7]
 29 U.S.C. § 151 (1975); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 182, 61 S.Ct. 845, 847, 85 L.Ed. 1271 (1941)
 
 
 [8]
 See e. g., NLRB v. Pacific Southwest Airlines, 550 F.2d 1148, 1150 (9th Cir. 1977); NLRB v. Vangas, Inc., 517 F.2d 747, 748 (9th Cir. 1975); NLRB v. Tri-State Stores, Inc., 477 F.2d 204, 205 (9th Cir. 1972) cert. denied 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974) (coercive interrogation); and Phelps Dodge Corp. v. NLRB, 313 U.S. at 181-82, 61 S.Ct. at 846-47; NLRB v. Ayer Lar Sanitarium, 436 F.2d 45, 47 (9th Cir. 1970); NLRB v. Buddy Schoellkopf Prod., 410 F.2d 82, 87-88 (5th Cir. 1969) (threats)
 
 
 [9]
 Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951); National Labor Relations Act, 29 U.S.C. § 160(e) (1975)
 
 
 [10]
 NLRB v. Ayer Lar Sanitarium, 436 F.2d at 49, quoting NLRB v. Luisi Truck Lines, 384 F.2d 842, 846 (9th Cir. 1967)
 
 
 [11]
 An election was never requested in this case
 
 
 [12]
 395 U.S. at 614, 89 S.Ct. at 1940; NLRB v. Four Winds Industries, 530 F.2d 75, 81 (9th Cir. 1976)
 
 
 [13]
 NLRB v. Pacific Southwest Airlines, 550 F.2d at 1153
 
 
 [14]
 Id. at 1152
 
 
 [15]
 NLRB v. Western Drug, 600 F.2d 1324, 1326 (9th Cir. 1979)
 
 
 [16]
 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32
 
 
 [17]
 NLRB v. Tri-State Stores, 477 F.2d at 206, quoting NLRB v. Ayer Lar Sanitarium, 436 F.2d at 48-49
 
 
 [18]
 395 U.S. at 620, 89 S.Ct. at 1943
 
 
 [19]
 600 F.2d at 1326
 
 
 [20]
 Id. at 1326 n.4
 
 
 [21]
 Id. at 1326-27 (footnotes omitted)
 
 
 [22]
 NLRB v. Coca-Cola Bottling Co. of San Mateo, 472 F.2d 140, 141 (9th Cir. 1972)
 
 
 [23]
 395 U.S. at 608, 89 S.Ct. at 1937 (footnote omitted)